UNITED STATES of America, Plaintiff,

v.

OAK BEACH INN
CORPORATION, Defendant.

No. 90 Civ. 2660 (RJW).

United States District Court,
S.D. New York.

July 9, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for plaintiff; Nancy G. Milburn, Richard Schwartz, of counsel.

Sussman, Gottlieb & Needleman, Commack, N.Y., for defendant; Ronald R. Sussman, of counsel.

## OPINION AND ORDER

ROBERT J. WARD, District Judge.

Plaintiff United States of America (the "Government") has moved, by order to show cause, for a preliminary injunction pursuant to Section 12 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 406 (the "Act") and Rule 65, Fed.R.Civ.P., requiring defendant Oak Beach Inn Corporation ("OBI") to: (1) refrain from engaging in any activity, including business or commercial activity, on or with respect to the 100–foot passenger ferry (the "Ferry") and the large steel barge (the "Barge") presently moored adjacent to the L-shaped pier at the Oak Beach Inn in Fire Island Inlet, Great South Bay, New York (the "Inn"); (2) remove the Ferry and the Barge from the waters adjacent to the Inn; and (3) refrain, during the pendency of this action, from placing any unauthorized structures or obstructions, or performing any unauthorized work, waterward of the mean high water mark without first having obtained all requisite federal and state permits. For the reasons that follow, the government's motion for preliminary injunctive relief is granted.

## BACKGROUND

In the instant action, the Government seeks to enjoin defendant from maintaining certain structures and/or alleged obstructions in the navigable waters of the United States, in violation of sections 403 and 406 of the Act. Defendant OBI is a New York corporation doing business at Oak Beach, Suffolk County, New York. OBI leases land on the north shore of Fire Island Inlet (the "Inlet") on which it operates the Inn, a restaurant and bar. Robert W. Matherson ("Matherson") was at all times relevant to this action the president of OBI.

This action is related to a previous lawsuit filed by a group of residents of Oak Beach, New York which challenged a decision of the Army Corps of Engineers (the "Army Corps") granting OBI an after-the-fact permit to maintain an unauthorized 25 foot extension to an existing timber pier (the "L-shaped pier") on Fire Island Inlet, and to permit construction of a 40 foot addition to the existing pier and the widening of a section of the preexisting pier structure. *See Oak Beach v. Marsh and OBI, et al.,* 82 Civ. 2359 (RJW) ("*Oak Beach I*"). While *Oak Beach I* was pending before this Court, and without any prior notice or authorization, defendant erected several structures which are the subject, *inter alia,* of the instant action. These included an unauthorized bulkhead, backfill, enclosure and deck. In addition, the Government in the instant action seeks the removal of an unauthorized 6 inch diameter water intake pipe, and the Ferry and Barge

which are the subject of the instant motion.[1]

In its decision in *Oak Beach I* granting summary judgment in favor of the Army Corps, filed September 2, 1987, the Court noted that OBI had constructed "additional structures below the mean high water line of the Fire Island Inlet ... [i]n contravention of the [Act], state authority, and this Court's directive," and ordered OBI to initiate after-the-fact permit procedures with respect to these structures. On November 6, 1989, the Army Corps denied OBI's after-the-fact permit application and ordered the removal of the deck, and removal of the bulkhead, backfill and pipe unless certain permits, certifications or waivers were obtained. No permits, certifications or waivers were obtained, nor were the structures removed as of a March 28, 1990 site visit which revealed only a partial removal of the unauthorized deck. Thus, on April 19, 1990, the U.S. commenced the instant action seeking removal of the remaining unauthorized structures.

While this action was pending, the Ferry and the Barge which are the subject of the instant motion were placed in their current position adjacent to the Inn. The Government then moved for a preliminary injunction requiring defendant to remove these vessels, alleging that they are permanently moored in navigable waters of the United States, and are obstructions to the navigable capacity of these waters, in violation of § 10 of the Act. Defendant disputed these allegations, arguing that the vessels were not permanently moored, and in any event did not obstruct navigation in any navigable waters of the United States.

On August 3, 1990, the Court held an evidentiary hearing in order to resolve these factual disputes. The Government called three witnesses. Joseph Seebode ("Seebode"), the chief of the regulatory branch within the operations division of the Army Corps, testified that the Inlet, including the channel which runs along the shore directly in front of the Inn, is part of a navigable waterway of the United States under the relevant regulations of the Army Corps and under the Act. He testified that the Inlet is "a very dynamic system that connects the Atlantic Ocean to Great South Bay." Transcript ("Tr.") at 19. According to Seebode's testimony, the high energy in the system has caused a channel to form "right along the shoreline, right along the village of Oak Beach and ... back around down into the outlet to the Atlantic Ocean." Tr. at 20. He stated that there are a number of vessels moored directly offshore from residences located on this channel, and that on a recent inspection a number of vessels, predominantly small power boats, were observed travelling in both directions through this channel. Tr. at 25.

In addition, Seebode described his observations of the Inn and of the Ferry and Barge during three site inspections which he conducted in 1988 and 1990. At his most recent inspection, on July 30, 1990, Seebode noted that "there was a barge and a ferry that had been moored inside the area ... within the L-shaped pier." Tr. at 35. The Government introduced in evidence several photographs depicting the Barge and the Ferry moored between the L-shaped pier and the Inn, which according to Seebode were accurate representations of what he observed on July 30. Seebode stated, and the photographs showed, that the barge had been refitted with a three foot fencing around its perimeter, a series of cables strung with decorative lanterns, planters, and approximately 80 lounge chairs on its deck.

The barge had been connected to the upper deck of the Ferry by two gangways, and secured to the Ferry by a series of lines. In addition, the barge was anchored in place by two spud piles—steel piles driven through a sleeve on the vessel to the sea bottom to hold the vessel in place—which according to Seebode are normally installed and removed by crane. Seebode observed that there was fencing around the upper deck of the Ferry, and that lounge chairs

---

**1.** Plaintiff does not seek preliminary relief with respect to the other structures at issue in this action.

had also been arranged on the upper deck of that vessel. Defendant conceded that the Barge was secured by lines and spud piles, and that both the Barge and the Ferry were being used as expanded floor space areas for the activities of the Inn. Tr. at 89.

It was Seebode's opinion, based upon his experience, that the Barge and the Ferry constitute obstructions to the navigable capacity of United States waters because of their mass, and because they occupy approximately 85 percent of the area within the L-shaped pier, where other vessels could otherwise navigate.[2] In addition, Seebode testified that in his opinion both the Barge and the Ferry are permanently moored floating vessels under the regulations of the Army Corps. He stated that he based his opinion to this effect upon both the uses to which the vessels were being put, which he described as non-water dependent, and the way in which they are held in place. Tr. at 50.

Michael Ludwig ("Ludwig"), an ecologist in the Habitat Protection Branch of the U.S. Department of Commerce National Oceanic and Atmospheric Administration's National Marine Fishery Reserves ("NMFR"), was also called as a witness by the government. He stated that his primary duty at NMFR is to assess requests by the public for construction activities in the navigable waters of the United States as defined in the Act and the regulations of the Army Corps, and that he has been employed by the NMFR for approximately 16 years. It was Ludwig's opinion that the placement of the Ferry and the Barge adjacent to the Inn caused an obstruction to the navigable capacity of the waters of the Inlet. In particular, Ludwig explained that the Inlet is unique in character, with approximately half a million cubic yards of

sand moving through the Inlet annually. That sand is kept suspended and in motion by the velocity of the water. He stated that the placement of the vessels will diminish navigability in the area by "enhancing the rate of deposition of material around those structures and by slowing the water velocity due to their displacement of the water column," thus causing shoaling. Tr. at 90.[3]

Finally, on behalf of the Government the Court heard testimony from Commander Wayne Ogle ("Ogle"), chief of the Inspection Department at the United States Coast Guard Marine Inspection Office in New York. Ogle stated that the Ferry does not have a currently valid certificate of inspection, which fact was then conceded by defendant. Tr. at 123. Based upon his review of Government's exhibit 13, a small passenger inspection book concerning the Ferry, Ogle opined that the vessel was not seaworthy at the time of the last inspection on November 13, 1989, and that if the vessel were currently in the condition observed by the inspector, he would believe that it was not seaworthy.[4]

Defendant called as its sole witness Richard Conway ("Conway"), a maritime consultant who was retained by Matherson in connection with his acquisition of the Ferry and the Barge. Conway, who has had both a business and a social relationship with Matherson for several years, testified that the vessels are not permanently moored to the L-shaped pier, and stated in his affidavit, which he adopted during his testimony, that both vessels are seaworthy. However, Conway testified that no repairs have been made to the Ferry since it was acquired by OBI, and that although the Ferry sailed to its current location under its own

---

**2.** The Government presented evidence at the Hearing that, in its application for an after-the-fact permit for the L-shaped pier, which was granted by the Army Corps, defendant stated that the purpose of the pier would be to provide docking space to vessels discharging customers at the Inn.

**3.** Ludwig also testified as to the harmful ecological effects of the vessels on the surrounding flora and fauna. The Government represented

to the Court the views of the NMFS were considered by the Army Corps in making its determination.

**4.** The inspection revealed that the Ferry had suffered extensive damage on the starboard bottom, some damage on the port side, and that many hull planks were fractured and a few were holed.

power,[5] there was an oil leak in the fuel line, and that the fuel line has now been removed. Thus, Conway acknowledged that the Ferry would not currently be able to sail under its own power unless a new fuel line were first installed.

Conway suggested that he had had conversations with Matherson concerning other possible uses of the Ferry, and that it was his understanding that Matherson was currently in the process of renovating the Ferry, which Conway described as an historic vessel. Matherson, in an affidavit submitted in opposition to the Government's motion, asserts that he intends to use the Ferry as a pleasure yacht. Nonetheless, it is undisputed that neither the Ferry nor the Barge have been moved since being brought to the Inn, and that they are now being used as an adjunct to the bar and restaurant area of the Inn.

The government maintains that the evidence presented at the Hearing and in the affidavits submitted in support of the instant motion demonstrates a likelihood of success on the part of the Government in proving that OBI is in violation of § 10 of the Act by virtue of the placement of the Ferry and the Barge adjacent to the Inn as expanded restaurant and bar space for the use of its patrons. Defendant argues that the Government has failed to demonstrate that the Inlet is navigable, that the vessels obstruct navigable capacity, or that the vessels are permanently moored. Thus, defendant asserts that preliminary relief is not warranted.

## DISCUSSION

1. *Likelihood of Success on the Merits.*

■ Section 10 of the Act provides in relevant part:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf,

pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army....

33 U.S.C. § 403.

The purpose of this section of the Act "is to prevent obstruction of the navigable capacity of the United States' waterways." *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir.1983); *Wisconsin v. Illinois*, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929). The section has three separate clauses, the first two of which, quoted above, are relevant here. The first clause prohibits the creation of obstructions to the navigable capacity of United States waters. The second clause is an enumeration of specific structures that may not be built "in any ... water of the United States" absent authorization from the Army Corps. As the Ninth Circuit has explained, the activities enumerated in clause two "are *presumed* to be obstructions to navigable capacity." *Id.* (emphasis in original) (quoting *Sierra Club v. Andrus*, 610 F.2d 581, 594–95 (9th Cir.1979), *rev'd on other grounds sub nom. California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (holding that there is no implied private right of action under § 10 and thus declining to reach the merits) *and judgment vacated Sierra Club v. Watt*, 451 U.S. 965, 101 S.Ct. 2039, 68 L.Ed.2d 344 (1981)). Thus, under this interpretation of section 10, which appears to accord with the plain language of the section, if the Court finds that plaintiff has demonstrated that the Ferry and the Barge are "other structures" within the meaning of clause two of section 10 of the Act, plaintiff need not also demonstrate an obstruction to the navigability of the waters at issue.[6]

---

**5.** This fact was further evidenced by a photograph, taken on May 30, 1990, depicting the Ferry proceeding into the Inlet under its own power.

**6.** The parties have not cited any Second Circuit authority concerning this issue, and the Court's research has uncovered none.

■ In interpreting and enforcing the second clause of section 10 of the Act, the Army Corps has promulgated a regulation to define the term "other structures" as used in the Act. 33 C.F.R. § 322.2(b) states that:

The term "structure" shall include, without limitation, any pier, boat dock, coat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, *permanently moored floating vessel,* piling, aid to navigation, or any other obstacle or obstruction.

Plaintiff claims that the vessels at issue are "permanently moored" and therefore constitute structures within this definition. Defendant asserts that the vessels are not permanently moored. This question is one of fact. *See United States v. Boyden, supra,* 696 F.2d at 688–89 (question whether houseboats were "permanently moored floating vessels" was one of fact to be determined by district court).

The Court finds, from the evidence presented at the Hearing, that the vessels are permanently moored under the regulations of the Army Corps and the Act. Seebode, an Army Corps employee with extensive experience in interpreting the Act and the regulations promulgated thereunder, testified that in his opinion the vessels are permanently moored. The factors upon which he based this conclusion—the use to which the vessels are being put and the manner in which they are secured—are in the Court's view reasonable ones upon which to rely in determining permanent mooring. Although defendant presented evidence that vessels which are temporarily moored might also be secured by lines, gangways and spud piles, Seebode explained that it was a combination of the two factors which led to his conclusion. In addition, the Court finds Matherson's affidavit testimony that he intends to use the

Ferry as a pleasure yacht not credible in light of the facts presented at the Hearing, including photographs of the vessels.

■ Even if the Court were to determine that the vessels are not permanently moored, they could still constitute "obstructions" to the navigable capacity of the Inlet. The Supreme Court has made clear that an "obstruction" need not consist of a "structure." *See United States v. Republic Steel Corp.,* 362 U.S. 482, 486–87, 80 S.Ct. 884, 887–88, 4 L.Ed.2d 903 (1960) (rejecting the argument that "obstruction" means some kind of structure and finding that industrial solids can constitute an obstruction in violation of the Act). Rather, "the term 'obstruction' as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses." *Id.* at 489, 80 S.Ct. at 888. Whether the vessels obstruct the navigable capacity of the Fire Island Inlet would appear to be a question of fact. *See United States v. Rio Grande Dan and Irrigation Co.,* 174 U.S. 690, 709, 19 S.Ct. 770, 777, 43 L.Ed. 1136 (1899) ("it becomes a question of fact whether the act sought to be enjoined is one which fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream").

■ In making the determination whether the Ferry and the Barge constitute "obstructions" to the navigable capacity of the waters of the United States, the Court must first determine whether plaintiff has demonstrated a likelihood of success on the issue whether the waters in question are part of a navigable waterway of the United States. "Navigable waters of the United States" is defined in 33 C.F.R. § 329.[7] The regulation states that, in general,

Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to trans-

---

7. Defendant has not challenged any of the Army Corps' regulations interpreting the Act. In any event, such interpretations of the Act by the agency charged with its enforcement are entitled to deference if reasonable and not in conflict with the expressed intent of Congress. *See*

*United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown,* 875 F.2d 453, 463 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990).

port interstate or foreign commerce. *A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.*

33 C.F.R. § 329.4. Specifically defining the geographic and jurisdictional limits of oceanic and tidal waters, § 329.12(2)(b) provides that, in the case of bays or estuaries:

> Regulatory jurisdiction extends to the entire surface and bed of all waterbodies subject to tidal action. Jurisdiction thus extends to the edge (as defined in paragraph (a)(2) of this section) [8] of all such waterbodies, *even though portions of such waterbodies may be extremely shallow, or obstructed by shoals, vegetation, or other barriers....*

33 C.F.R. § 329.12(2)(b).

The test for navigable capacity is thus quite broad, and encompasses waters which may be made navigable through "reasonable improvement." *See* 33 C.F.R. § 329.8; *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 407, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940).[9] In addition, OBI does not appear to dispute the proposition that the main body of the Inlet, as opposed to the portion directly in front of the Inn, is a navigable water of the United States. OBI's argument is, instead, that because the channel which runs directly in front of the Inn is bounded on its eastward end by a shoal causing the water to be relatively shallow, that portion of the Inlet is not subject to the jurisdiction of the Army Corps. This argument is without merit, both as a matter of fact and as a matter of law.

Factually, the Court finds that the Government has demonstrated that the channel adjacent to the Inn is itself naviga-ble. The Government presented evidence at the Hearing that vessels, including fishing and crabbing boats, are able to navigate the entire channel, including the shallower eastern end. Boats were observed travelling in both directions over the channel. In any event, defendant has not presented the Court with a valid rationale for the proposition that the channel can only be considered navigable if large boats can sail through both ends into the main body of the Inlet. Clearly, large boats of the size of the Ferry and the Barge are able to navigate in and around the area of the Inn.

Legally, the Corps has jurisdiction over channels or canals which connect directly to navigable waterways. *See United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1299 (5th Cir.1976) (discussing canals). The channel at issue in this case indisputably connects directly to the Inlet, a navigable waterway. Thus, while the depth of the water at one end of the channel might be relevant to the issue whether the placement of the Ferry and Barge *obstructs* navigable capacity, it is not relevant to a determination whether the channel is part of the navigable waters of the United States for purposes of Army Corps jurisdiction.

▪ Nonetheless, plaintiff must still demonstrate a likelihood of success on the separate issue whether the vessels constitute an "obstruction" to navigable capacity.[10] This showing can include, for example, a demonstration that the flow of the water is altered, or that the condition or course of the water is otherwise affected. *See* 33 C.F.R. § 322(3)(a). The threshold for a finding of obstruction is quite low, *see United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960)

**8.** Paragraph (a)(2) provides in relevant part that "[r]egulatory jurisdiction in coastal areas extends to the line on the shore reached by the plane of the mean (average) high water." 33 C.F.R. § 329.12(a)(2).

**9.** Section 329.3 states that "[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclu-sively by administrative agencies." 33 C.F.R. § 329.3.

**10.** As noted above, Ninth Circuit case law holds that the Government need not demonstrate this element if it shows that the vessels are a "structure" by virtue of being "permanently moored." In such a situation, that Circuit has determined that the element of obstruction is presumed.

(encouraging a broad interpretation of a section 10 "obstruction," including fluctuation in water level as well as clogging of channel with deposits of inorganic solids), but some articulation of the obstruction to navigable capacity is required.

The Court finds in this case that the Government has presented sufficient evidence to demonstrate a likelihood of success on the issue of obstruction to navigable capacity. In the first place, Seebode of the Army Corps has determined that the mass and placement of the vessels constitute an obstruction.[11] This conclusion is reasonable in light of the sheer size of the vessels in the relatively narrow channel, and the fact that the L-shaped pier which was purportedly to be used by other vessels to dock temporarily at the Inn can no longer be used in that manner, at least on the inner portion of the pier, because of the presence of the Ferry and the Barge. Further, Ludwig testified that the presence of the Ferry and the Barge are likely to cause accelerated deposition and shoaling in the channel by slowing the velocity of the water passing through. In addition to impacting on the channel itself, it is reasonable to infer that the slowing of the water velocity through the channel will affect the water flow through the rest of the Inlet, which has been described by Seebode as "a very dynamic system." Accordingly, the Court finds that the Government has demonstrated a likelihood of success on the issue of obstruction to navigable capacity.

In sum, the Court finds that the Inlet, including the channel which passes in front of the Inn, is part of the navigable waters of the United States subject to the jurisdiction of the Army Corps. The Court further finds that the Ferry and the Barge have been "permanently moored" at their present location, and thus that they consti-tute an unpermitted structure in violation of the Act. In addition, even if the Government had not demonstrated that the vessels were "structures" under the Act by virtue of being "permanently moored," they nonetheless constitute obstructions to navigable capacity and thus violate the first clause of § 10.

### 2. Standard for Granting Preliminary Relief.

■ Defendant argues that, in order to prevail on its application for a preliminary injunction, plaintiff must demonstrate "immediate harm" to the navigable waterways of the United States. No authority is cited for this assertion, and in fact the case law holds that where "Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed." *United States v. Schmitt*, 734 F.Supp. 1035, 1049 (E.D.N.Y.1990). Here, section 12 of the Act expressly provides:

the removal of any structures or parts of structures erected in violation of the provisions of [sections 401, 403, and 404] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist,[12] and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

33 U.S.C. § 406. A district court in this Circuit has recently held, after a thorough examination of the relevant authority, that under the Act, "the Government is not required to demonstrate irreparable harm in order for a preliminary injunction to issue." *United States v. Schmitt, supra*, 734 F.Supp. at 1048–49.[13] Accordingly, be-

---

**11.** The Fifth Circuit has stated that "[t]he imprecise statutory language of section 10 leaves the Corps with quasi-legal authority to determine what 'effects' constitute 'obstructions' or 'impacts' to navigable capacity." *Vieux Carre Property Owners v. Brown, supra*, 875 F.2d at 463. Thus, the determination of the Corps should be given deference if reasonable. *Id.*

**12.** Although the structures exist in waters in the Eastern District of New York, this District has concurrent jurisdiction over the waters within the Eastern District. 28 U.S.C. § 112; *Hudson Harbor 79th Street Boat Basin v. Sea Casa*, 469 F.Supp. 987, 990 (S.D.N.Y.1979).

**13.** Although the injunction provision in 33 U.S.C. § 406 refers only to "structures," the Court of Appeals for the Second Circuit has held

cause plaintiff has demonstrated a likelihood of success on the merits of its claim that the Ferry and the Barge constitute violations of 33 U.S.C. § 403, no further showing is required for a grant of preliminary relief.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is granted. Defendant OBI, its officers, agents, employees, servants and attorneys are hereby directed to immediately: (1) refrain from engaging in any activity (including but not limited to any construction, refurbishment, business or commercial activity) on or with respect to the Ferry and the Barge while they are moored in or near their present location adjacent to the Inn; (2) remove the Ferry and the Barge from the waters adjacent to the Inn; and (3) refrain, during the pendency of this action, from placing any unauthorized structures or obstructions, or from performing any unauthorized work waterward of the mean high water mark without first having obtained all requisite federal and state permits.

The parties are further directed to submit a status letter to the Court on or before August 31, 1990.

It is so ordered.

that this provision also applies to obstructions other than structures which violate 33 U.S.C. § 403. *United States v. Perma Paving Co.,* 332 F.2d 754, 757 (2d Cir.1964). The Government also argues that, even were § 12 to be read to apply only to "structures," it would still be applicable in this case because the regulations of the

Army Corps define "structure" in 33 C.F.R. § 322.2(b) to include "any other obstacle or obstruction" beyond those enumerated in that part. Further, plaintiff argues that an injunction would be proper under the Court's equity jurisdiction.