# RUSSELL & COMPANY S. EN C.

*v.*

# HENNA ET AL.

---

San Juan, Equity, No. 970.

CONFLICTING IRRIGATION RIGHTS.

Practice—Opinion of Circuit Court of Appeals.

    1. A construction of a contract in a case by the circuit court of

Russell & Co. v. Henna.

appeals binds the court below; but what the circuit court of appeals says arguendo about a contract which it declares is to be construed by this court in the light of circumstances not yet before the court is not intended as a binding construction.

**Contract—Surrounding Circumstances.**

2. The old rule that a latent ambiguity can be solved by considering the circumstances under which it was made is now expressed more broadly as allowing attending facts to be shown in order to aid in its construction. Intention cannot be shown except by evidence of surrounding circumstances, acts, and statements binding those contracting. Negotiations leading up to a contract are merged in the contract.

**Local Laws—Irrigation.**

3. Local rules and customs as to irrigation are recognized by the Federal legislation. In Porto Rico these are governed by the Spanish Law of Waters of 1866 and Irrigation Laws of 1908 and 1913.

**Irrigation Contract—Grant.**

4. While an irrigation contract may amount to a regulation of water already conceded, if there is an additional element, such as regularity of supply by the government, words in the nature of a grant are always construed in favor of the government.

**Same—Concessions.**

5. Where the contract provides as a consideration a quantity of water specific in amount, other water available at a certain point after satisfying concessions, and torrential water not covered by former grants, the court cannot consider any one of these elements to the exclusion of the rest.

**Same—Meaning of Words.**

6. Words used in the contract must be given some meaning, and that meaning must not be one which will allow one party to the contract to do what he pleases regardless of the interests of the other. Contracts cannot be left to the will of one of the contracting parties.

Opinion filed July 16, 1918.

Russell & Co. v. Henna.

Statement of Facts.

The bill in this cause was filed April 7, 1916, by the Fortuna Estates, a corporation, against Emilia V. Henna et al., praying for an injunction against defendants from interfering with irrigation rights claimed in the Jacaguas river. The injunction was granted without prejudice to the merits, and after decision on appeal this was dismissed March 27, 1917. Shortly afterwards in accordance with the opinion of the court of appeals an order was here entered that the people of Porto Rico be notified to elect whether to join as a party, and on May 3, 1917, the people of Porto Rico accordingly filed an answer, which was afterwards amended. On July 26, Russell & Company, S. en C., having purchased the interest of the plaintiff, was substituted in its stead. The water has been divided pending litigation, the people of Porto Rico being paid their contract rate. January 25, 1918, the motion to strike certain parts of the answer was granted, and on April 2, after hearing on the merits, the cause was submitted for decree. By consent the court visited the locus in quo and examined the different intakes.

The Jacaguas river is one rising in the mountains on the south side of the Island and flowing to the sea through rich sugar lands that need more irrigation than can be furnished by that stream. The Jacaguas, much if not most of the time, is practically dry in its lower parts, the permanent stream being absorbed by irrigation grants further up the river than those covered by the suit in question. During the rainy season, which usually begins in June, there is water which will supply everyone. The banks are high at the points now in controversy, and when the river becomes a torrent, as it does after heavy rains,

Russell & Co. v. Henna.

the banks are badly washed, and even the artificial intakes are affected, wing and other walls being overturned. When water is thus abundant there come into play intakes at higher levels which conduct torrential waters through the high banks to the fields, which at a little distance away are lower than the river banks. In order to render the supply of water more even there are at different points pumps,—some to take the water from the river, others for subterranean waters.

The plaintiff shows that he is the owner of four tracts of land in the municipality of Juana Diaz named Fortuna, Cristina, Luciana, and Serrano, each with the right to take from the River Jacaguas for irrigation a certain number of liters of water per second, equivalent to what is expressed as a certain number of acre feet of water per year, amounting in the aggregate to 11,032.79 acre feet of water per year. The haciendas interested in irrigation from the Jacaguas river amount to twelve in addition to the right of the pueblo of Juana Diaz to take drinking water therefrom,—the grant of Serrano dating from 1845, Fortuna from 1841, Luciana from 1848, and Cristina from 1852. The water in the river is frequently insufficient, and so the royal orders fixed a certain order of suspension of the right to take water, of which after Juana Diaz Fortuna is the last to suffer of all the thirteen places in interest, Serrano the eleventh, and Cristina and Luciana the fourth and fifth respectively. The hacienda of the defendants, Boca Chica, is named in this list as having an irrigation concession dated 1845, and it is the third to be suspended in case of lack of water. Plaintiff is shown also to have been the owner by virtue of concessions, decrees, and prescription of the right to take for irrigation torrential waters from the Jacaguas without limit for all four of said estates.

On account of the uncertainty of the supply of water on the south side of the Island, however, the people of Porto Rico undertook a general irrigation system by act of the legislative assembly of Porto Rico of September 18, 1908, and a part thereof was the erection of what is called the Guayabal dam at the sources of the Jacaguas river, taking in also a stream called the Rio Toro Negro, which theretofore flowed to the north side of the dividing ridge of mountains. The same legislation, and particularly § 13 of the Act No. 128 of the Laws of August 8, 1913, prescribed as follows:

"In the case of any land carrying a water right or concession of which the source of supply is destroyed or impaired by the construction or operation of the irrigation system, which shall not have been relinquished or surrendered to the people of Porto Rico, such land shall be entitled to receive from the irrigation system an amount of water which is the reasonable equivalent in value of the said water right of concession.

"The Commissioner of the Interior is hereby authorized to negotiate with the owner or owners of rights or concessions, and with the owner or owners of any water rights or concessions heretofore relinquished or surrendered on the condition that the lands to which they are appurtenant shall form part of the irrigation district, and which lands have not been included in the Irrigation Commission, and the said Commissioner of the Interior shall be empowered to enter into agreements with such owner or owners as to the amount of water and the time, place and conditions of delivery thereof, which shall be delivered to the lands to which the said water rights or concessions are appurtenant as the fair equivalent in value thereof, with the power on behalf of the irrigation service to enter into the

Russell & Co. v. Henna.

.agreement with such owner or owners for the relinquishment to The people of Porto Rico of such water rights or concessions, and for the delivery to the lands to which the said water rights or concessions are appurtenant of such fair equivalent. Before entering into any such agreement the Commissioner of the Interior shall consult the Attorney General of Porto Rico as to the validity and legal status of the water rights or concessions involved."

In consequence of this the Commissioner on August 26, 1914, entered into the contract in question with the plaintiff's predecessor, the instrument containing a provision that it might be reduced to a public instrument if desired, which was accordingly done June 8, 1915, in the same words. The contract in its preambles recognizes the ownership of Fortuna Estates in the four tracts of land, with the right to use thereon waters from the Jacaguas river and the use of such water by Fortuna for upwards of twenty years, together with torrential waters, that these were rights relinquished to the people of Porto Rico, and contains also the additional preamble as follows:

"Whereas, the amount of water taken by the Fortuna Estates and its predecessors in title for the irrigation of said four tracts of land under its said claims of water rights varies from month to month in accordance with the rainfall in the watershed of the said Jacaguas river, so that it is impossible to determine in advance the exact amount of water to which the Fortuna Estates is entitled under the said claimed water rights for any fixed period of time, and the people of Porto Rico (notwithstanding the construction and operation of said Guayabal dam) is ready to deliver from the said Jacaguas river to the said Fortuna Estates the amount of water to which the latter

may be entitled under its said concessions, but, in order to facilitate and make more certain the operation of the said dam and the irrigation system of which it is a part, desires to determine and agree upon an amount of water which, delivered regularly, may, under all attending circumstances, be considered to be the fair equivalent in value for irrigation purposes of the amount of water which the Fortuna Estates would under ordinary circumstances take and use under the said water rights and concessions; and

"Whereas, the Commissioner of the Interior is authorized and empowered, by § 13 of the amendment to the Public Irrigation Law, approved August 8, 1913, after consulting with the Attorney General of Porto Rico as to the validity and legal status of the said water rights or concessions, to enter, on behalf of the people of Porto Rico, into agreement with the owner of the said water rights or concessions upon an amount of water equivalent to the water taken and used under said water rights and concessions, and as to the time, place, and conditions of delivery thereof to the lands to which the said water rights or concessions are appurtenant."

Thereupon comes the agreement, of which paragraphs one, two, three and four, so far as applicable, are as follows:

"First. The parties hereto hereby agree that the quantities of water specified in this paragraph, delivered uniformly through the year, subject to the terms and conditions specified in this agreement, together with the additional water, the right to take which is provided for or reserved in paragraph 3d and 4th hereof, are the fair equivalent in value of the water which the said Fortuna Estates takes under and pursuant to the concessions and water rights claimed by it, and the people of

Porto Rico will, subject to the conditions and limitations here-inafter specified, and at the times, places, and subject to the conditions of delivery hereinafter provide for, make delivery to the Fortuna Estates, for the irrigation of the said tracts of land hereinabove referred to, of the said amounts of water, to wit:

"For the Estate Fortuna, 3,306.45 acre feet per year; for the Estate Cristina, 1,312.48 acre feet per year; for the Estate Luciana, 1,260.22 acre feet per year; for the Estate Serrano, 2,379.83 acre feet per year. The waters so to be delivered shall be delivered, subject to the conditions hereinbelow expressed, in substantially equal quantities from day to day; to wit, for the Estate Fortuna, 9.06 acre feet daily; for the estate Cristina, 3.59 acre feet daily; for the Estate Luciana, 3.45 acre feet daily; for the Estate Serrano, 6.52 acre feet daily.

"Second. The people of Porto Rico will deliver the said water as follows: (a) The water deliverable hereunder for the Estate Fortuna, at the intake provided by Fortuna Estate for a reservoir established on the Estate Cristina. (b) The water deliverable hereunder for the Estate Cristina as follows: 741.21 acre feet per annum at the intake provided by Fortuna Estates for a reservoir established on the Estate Cristina, and 571.27 acre feet per annum in the bed of the river to be taken by pump at a pumping station heretofore established by the Fortuna Estates near the right bank of the said Jacaguas river, known as the Aruz pumping station. (c) The water deliverable hereunder for the Estate Serrano, at the present low-water intake of that estate on the Jacaguas river. . . .

"Third. Fortuna Estates is hereby granted the right while

this agreement remains in force to take an addition to all amounts of water above specified, from the Jacaguas river by pump at the said Aruz pumping station, water which may be available there for irrigation of any of its said lands, to the extent that such taking shall not deprive any owners or users of subsisting water rights or concessions upon the Jacaguas river of the water to which such owners or users may be entitled, either by virtue of such water rights or concessions or by virtue of any agreement or agreements in regard thereto entered into or to be entered into by them with the people of Porto Rico; Provided, however, that should the people of Porto Rico at any time undertake the development and utilization of the surplus waters of this part of the Jacaguas River, this right shall be understood to be limited to a maximum usage of 3.86 second feet. The Fortuna Estates shall maintain at the said Aruz pumping station an accurate and appropriate measuring device for the measurement of the water taken from the river at such station, which shall at reasonable time be subject to inspection by the properly accredited employees of the irrigation service.

"Fourth. In addition to the amounts of water hereinbefore set forth, the Fortuna Estates hereby reserves and shall have the right to take torrential waters from the Jacaguas river through its head-gates at present existing for the use of torrential waters. Such headgates, wherever they do not conform to the terms of the concession, shall be reconstructed in conformity therewith, and such use of torrential waters shall be subject to such priorities in the use of torrential waters as may exist in the said Jacaguas river. The foregoing provision, however, shall not in any way limit the people of Porto Rico from restraining all of the torrential flood waters which it may desire

and which it may be legally entitled to restrain in the reservoir above the Guayabal dam. . . . .

The contract goes on in a number of subsequent paragraphs to provide that the water to be furnished is exclusive from that of the Toro Negro river, recognizes suspension as in the royal order above, and paragraphs eleven, twelve and thirteen are as follows:

"Eleventh. It is agreed by both parties that the delivery to and the use by the Fortuna Estates of water in accordance with the terms and conditions expressed in this agreement shall not in any event affect or modify the present existing status of the water rights and concessions claimed by the said Fortuna Estates; but that such delivery and use is to be made in view of the modified physical conditions resulting in the bed of the river Jacaguas from the establishment of the public irrigation system, which, on the one hand, will henceforth permit the delivery to and the use by the Fortuna Estates of a substantially uniform flow of water, as provided in this agreement, and, on the other, modifies to some extent the use of the water heretofore made by the Fortuna Estates; that such delivery and use shall continue as long as such modified conditions continue to exist, and in the event of the total or partial destruction of the Guayabal dam, or of the main canal known as the Juana Diaz Canal, connected therewith, from any cause whatsoever, and the resulting inability of the people of Porto Rico to comply with the terms of this agreement, the Fortuna Estates may forthwith exercise such rights as it has under the said concessions and grants, but as soon as the people of Porto Rico shall have re-established or reconstructed the works so destroyed in substantially the same form as at present constructed, or in

such a manner as to enable it to perform substantially the terms of this agreement this agreement shall be revived and be in full force and effect from such time.

"Twelfth. Neither the execution of this agreement by the Fortuna Estates nor the acceptance and use of water delivered to it as herein provided, nor any consent, waiver, or permission given or held to be given hereby or hereunder, nor any failure on the part of the Fortuna Estates, acting in accordance with this agreement to take and use water in accordance with the exact terms of its said concessions and water rights, or any of them, nor anything done or suffered by said Fortuna Estates hereunder or in accordance with the terms hereof or pursuant to the provisions herein contained, shall at any time or for any purpose be deemed to affect, modify, or change to any extent the status of the said water rights and concessions claimed by the Fortuna Estates as existing at the time this agreement was entered into, or to limit or prejudice any rights or privileges which the Fortuna Estates, its successors, or assigns may have under or by virtue of the said concessions, and the grants and decrees respecting the same hereinabove described, or by virtue of the use of the said water of said Jacaguas river, heretofore made by it and its predecessors in title.

"Thirteenth. In the event of the permanent abandonment by the people of Porto Rico of said irrigation system utilizing the waters of the Jacaguas river, or in the event that the people of Porto Rico or the official or officials body in charge of the irrigation service shall be enjoined or restrained by final order or decree of any court of competent jurisdiction from carrying out the provisions of this agreement, then this agreement shall become null and of no force, and the Fortuna Estates shall be

entitled to the exercise of any and all the rights which it had at the time this agreement was entered into, as if this agreement had never been entered into or performed, in whole or in part, by either party hereto; . . ."

The contract incorporates as a schedule the dates of the irrigation and of the torrential concessions, the latter being all dated June 8, 1880.

The defendants' right to take water is at the point called Maturi Pool, about a thousand feet above the Aruz pump, through an old intake reconstructed by the defendants under the supervision of the Irrigation Department, under a contract of purchase of water with the people of Porto Rico, dated originally December 14, 1915, and extended on June 28, 1917. The defendants' claim rests upon the right given by the Irrigation Law to the Commissioner of the Interior to sell water. This contract describes the plantation, and in consideration of $6 per day to be paid by the owners the people of Porto Rico by the Commissioner of the Interior agreed to deliver excess water from the Maturi Pool on the Jacaguas river to the canal known as the Maturi canal. The instrument provides that "this contract shall in no way modify or change the provisions of prior contracts involving water concessions on the Jacaguas river, nor shall the delivery of water under the terms of this contract be construed as the restoration of any former water rights pertaining to the so-called Maturi canal."

The agreement was subject to the ratification of the Executive Council, which was had February 15, 1916.

There was not much dispute as to the facts of the case, the different instruments being all placed in evidence. The main question was as to their proper construction relative to the claims of the respective parties.

*Russell & Co. v. Henna.*

*Messrs. O. B. Frazer* and *Francis E. Neagle* for plaintiff.

*Messrs. Chas. Hartzell* and *Parra Capó* for defendant Henna.

*Messrs. H. L. Kern,* Attorney General; and *Jaime Sifre* of counsel for People of Porto Rico, intervening.

HAMILTON, Judge, delivered the following opinion:

1. Upon the argument, attention was called to the fact that the circuit court of appeals, while not determining the questions involved, during its opinion seemed inclined to construe the words of the contract in a certain manner. There are only two ways of looking at this. If the circuit court of appeals considered that it had enough of the case before it to justify the construction of the contract in any particular way, that construction would be binding upon the court below and would of course be followed. In the case at bar, however, this does not seem to be the case. The court above recognized that the contract could only be construed in the light of the circumstances under which it was executed and contemporaneous construction of the parties themselves, and these were not before that court, but were expressly left to be adjudicated by the district court. Whatever the circuit court of appeals said, therefore, is to be considered merely as arguendo, and not as binding or intended to be binding upon this court.

2. When the case was before the court on the application for preliminary injunction, attention was attracted by the provision in the contract that the insular government reserved the right to develop the lower part of the Jacaguas river. It was

conceded on the hearing, however, by both sides, as it is in the briefs, that in point of fact the irrigation department has not developed this part of the Jacaguas river. Whatever inferences may be just from the reservation of the right will be made; but the case cannot be considered upon the theory that the grant of privilege shown by the evidence in this case is affected by any such development. So far as the facts stand there are merely the two contracts, supposedly conflicting; and it is for the court to reconcile them or otherwise determine the situation of the parties, with the Jacaguas undeveloped by the irrigation authorities. The delivery of water in use is not by means of the river development named by the exception in the contract, and is not affected by it in any way.

3. The decision of the case will depend upon the proper construction more particularly of the contract set out by the plaintiff in his bill. Upon the trial he sought to bring out evidence of negotiations between his predecessor and the Irrigation Department of the insular government, with a view to throwing light upon the contract. The general principle is that a written contract stands or falls by itself. It may be varied by parol, but in such case it becomes a new contract. Glover v. McGilvray, 63 Ala. 508. It cannot be varied in any material part by parol testimony. Bank of Mobile v. Mobile & O. R. Co. 69 Ala. 306. It used to be expressed that, where there is latent ambiguity in a contract, the circumstances under which it was made can be received in order to explain. The modern rule has been expressed more broadly to be that attending facts and circumstances connected with a contract may be shown in order to aid in its construction, but that this does not go so far as to authorize evidence of intention. Humes v. Bernstein, 72 Ala.

X. Porto Rico.—32.

554. Intention cannot be testified to as a matter of fact; it is a mental operation, and can only be got at by evidence of the surrounding circumstances, or of the acts and statements of the parties in question. This rule applies also to motive and belief. Whizenant v. State, 71 Ala. 383; Sternau v. Marx, 58 Ala. 608. Intention must be derived from the facts existing at the time of the contract, and not generally from subsequent declarations. Mobile Bldg. & L. Asso. v. Robertson, 65 Ala. 382. Thus the intention of the makers of an instrument is to be got at from the objects sought, the relations of the parties, and the general situation, the motives, and the like. Evington v. Smith, 66 Ala. 398; Watts v. Sheppard, 2 Ala. 425. In the same way negotiations leading up to a contract are held to be merged in the writing itself and therefore cannot be testified to. Any other rule would be reopening the whole transaction, and the court, instead of construing an existing contract, would be making one over again for the parties.

Accordingly upon the trial it was held that negotiations between the plaintiff's predecessor and the Irrigation Department could not be shown, and that this was particularly true as to their intentions. On the other hand, the fullest scope was allowed to evidence showing their situation before the contract was made, with a view of developing what was the motive and intention of the parties in making the contract. No reason is shown to change this view.

4. The first question coming up in all Porto Rican cases is as to the law controlling. The United States have recognized local water rules and customs. Revised Stat. § 2339, Comp. Stat. 1916, § 4647. It is well recognized that a state can divert even navigable waters for irrigation or other purposes at its will,

unless and until the United States deem it proper to interfere for navigation or other national purposes. United States v. Rio Grande Dam & Irrig. Co. 174 U. S. 690, 43 L. ed. 1136, 19 Sup. Ct. Rep. 770. For some purposes, especially for irrigation, the law recognizes that local law may grant rights to the water of a stream to other parties than the riparian owner. Gutierres v. Albuquerque Land & Irrig. Co. 188 U. S. 545, 556, 47 L. ed. 588, 593, 23 Sup. Ct. Rep. 338. It was in that case left open whether the same rule applied to a territory, but the present (like the preceding) Organic Act of Porto Rico, § 57, expressly leaves in force local laws, at least until they are expressly set aside by express legislation. There has been no such express Federal legislation, and so the question in the case at bar is as to a local law.

The local law in Porto Rico, therefore, is what is called the Law of Waters, coming down from Spanish times. This is the law of 1866, but the provisions as to irrigation go back to the times of the Moors in Spain. The law covering the present day water rights connected with the insular irrigation system is found in the Acts of 1908 and 1913, whose provisions must be carefully considered. Acts Extraordinary Session 1913, No. 128, page 54.

This is a careful act of thirty-seven sections, providing for a commission to fix irrigation districts, in which the commisson shall acquire the water rights outstanding, agreeing to deliver to the concessionaire the fair equivalent in value in acre feet per annum reasonably distributed through the year. There was to be first a provisional arrangement, and afterwards permanent irrigation districts, the commission giving due consideration to all water rights or concessions and to the results and effects of

the operaton of the irrigation system, including lands with water rights and those without. § 7. The commission fixed the taxation to be imposed for water in connection with the irrigation fund. § 11. The right of appeal was provided for both as to relinquished lands and those not relinquished. § 13. The standard for the amount of water is 4 acre feet per acre per annum. § 18. Bonds were to be issued up to $1,000,000 to provide funds for the irrigation works and system. §§ 19–29.

The contract in question is one made by the Commissioner of the Interior under § 13 of this act; and its wording, found in the statement of facts, is therefore important. Acts Extraordinary Sessions 1913, p. 72. It must be construed in connection with the provisions in the Law of Waters that "authority is necessary for use of public waters especially destined to enterprises of public or private interests" (art. 147); and "in any event when a public investigation is made with respect to any grant of waters, the holder of such rights shall be obliged to establish them in the manner and at the time prescribed by the regulations." Art. 148. "He who shall have enjoyed the use of public waters for a period of twenty years without the opposition on the part of the authorities or a third person shall continue to enjoy it even though he cannot prove that he has obtained the proper authority." Art. 149. It has been held that prescription as to waters, twenty years, may be set up as to the right, but that this does not carry with it any specific quantity unless that be otherwise proved. Trujillo v. Rodriguez, 22 P. R. R. 280; s. c. 147 C. C. A. 214, 233 Fed. 208. There are definite requirements in connection with public grants, but no question is made as to the right of the plaintiff under his concessions.

Russell & Co. v. Henna.

5. The theory of the bill of complaint is that the right of plaintiff rests now as fully as it ever did upon certain undisputed Spanish concessions, and that the contract was designed to and actually did only vary time and place of receipt of water, and did not affect the quantity to be received. The contract unquestionably asserts and goes upon the basis of the complete validity of plaintiff's concessions, so much so that it aims to supply a fair equivalent for the concession waters. There is no doubt that under ¶¶ 12 and 13 of the contract the people of Porto Rico recognize the concessions, and agree that, upon the happening of any event to end or even disturb the supply of water under the contract, the plaintiffs may exercise all their original rights, and that the contract does not at any time or for any purpose affect, modify, or change to any extent the status of the concessions. It is not, therefore, the original grant of water belonging to the people of Porto Rico, but a regulation of the supply of water which in some shape belongs already to the plaintiff. The only time the word "grant" is used in connection with the water is in ¶ 3, when Fortuna is "granted" the right while this agreement remains in force to take by the Aruz pump water available there in addition to the specific amounts granted in ¶ 1. The specific water is not "granted," but is agreed to be "delivered" by the people of Porto Rico.

But it is the additional water that is in question in this case, that is to say, that which according to the contract is granted. While the contract may be a regulation, and to some extent a regulation of the use of water already owned, it embraces the additional element of regularity of supply, and it is difficult to see how, made as it is between the government and an individual, it can be construed otherwise than upon the principle of

a grant. Grants are always construed in favor of the government. Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. ed. 773; Stein v. Bienville Water Supply Co. 141 U. S. 67, 80, 35 L. ed. 622, 627, 11 Sup. Ct. Rep. 892.

6. The contract in question relates to concession water of certain specified quantities, and also in addition to take "by pump at the said Aruz pumping station water which may be available there for the irrigation of any of its said lands to the extent that such taking shall not deprive any owners or users of subsisting water rights or concessions." This does not use the word "excess" or "surplus," but it would seem to be the same thing as excess or surplus waters, for it is what remains after other rights have been satisfied. Surplus water has been defined as that remaining after prior rights are complied with. Gutierres v. Albuquerque Land & Irrig. Co. 188 U. S. 545, 556, 47 L. ed. 588, 593, 23 Sup. Ct. Rep. 338. It would seem to come under § 14 (§ 3) of the act as amended, to the effect "that the Commissioner of the Interior under such rules and regulations as may be established by the Executive Council may sell or lease water controlled by the irrigation service and in excess of the water required by law on the lands . . . for the irrigation of lands either within or without the . . . district . . . and the proceeds of such sales or leases shall be applied to the decrease of annual assessments." (Page 81.) No such rules and regulations are in evidence, but, as the Executive Council approved the contract in question, it may be supposed that these were complied with.

The contract between the plaintiff and the people of Porto Rico is mutual, that is to say, Fortuna gives up temporarily the exercise of its concession rights, and the consideration there-

for is that the people of Porto Rico agree to deliver to Fortuna at certain agreed times and places water the equivalent in value. Neither party can change the contract to the disadvantage of the other, and both parties agree that the equivalent in value of the water up to that time enjoyed by Fortuna under its Spanish concessions is: (1) A quantity of water specific in amount and time delivered by the irrigation authorities not wholly from the river, but in part at least from a certain Juana Diaz canal operated by the irrigation service from the Guayabal dam; (2) water which may be available at the Aruz pump after satisfying other of the thirteen concessions; and (3) torrential water, which is expressly stated in the contract to be reserved by Fortuna as of its former rights. Omitting, therefore, the unquestioned torrential water, the contract is for water from the dam and surplus water above existing concessions and available in the Jacaguas river, not to exceed a certain amount, which, added to the specific water in ¶ 1 amounts to the total possible quantity which Fortuna had before this contract was signed. All three kinds of water make up the consideration in the contract, and this court has no right to determine that any less than the three named shall be the consideration. The question is, What is fairly within the three?

7. On the other hand, the defendants' right based upon a contract of June 28, 1917, has, so far as appears upon its face, no relation whatever to any concession. It is true Boca Chica enjoyed a concession from the Spanish government, but it was secondary to Fortuna's concession and of less value because its water was to be cut off sooner than that of Fortuna. Defendants' contract is therefore not based upon this concession, but amounts purely and simply to a purchase of so much surplus

Russell & Co. v. Henna.

water from the irrigation authorities, to be delivered, however, at the Maturi canal, which is about 1,000 feet higher up the river than the Aruz pump; and this would divert water which would otherwise come on down the river bed to the Aruz pump. The plaintiff does not seem to question this sale, although it puts him at a disadvantage. His complaint is that the defendants had erected a dam across the river bed which effectually retains all the water coming down the river, diverts it to this Maturi canal, and prevents there being any water except in flood time, which is otherwise provided for, available at the Aruz pump mentioned in the plaintiff's contract. The situation, therefore, is that the conflicting Aruz and Maturi intakes relate to contract water as distinguished from concession water, but that the plaintiff's contract water is part of the equivalent agreed on August 26, 1914, for the temporary abandonment of plaintiff's concession rights, while the defendant's contract water is based upon the purchase from the irrigation authorities dated June 28, 1917. If they conflict, the earlier must control; for prior est in tempore prior est in jure.

The words, "available there," must have some meaning. If Porto Rico can take away with one hand what it gives with the other it will be making a one-sided contract, which it has forbidden its citizens to make, and will be violating the obligation of its own prior contract.

P. R. Civ. Code § 1223. "The validity and fulfilment of contracts cannot be left to the will of one of the contracting parties."

P. R. Civ. Code § 1241. "In contracts, involving a valuable consideration, the prestation or promise of a thing or services by the other party is understood as a consideration for each

contracting party; in remuneratory contracts, the service or benefits remunerated, and in those of pure beneficence, the mere liberality of the benefactor." [Compilation 1911, §§ 4329, 4347.]

If the contention of the defendants is correct, the irrigation authorities could build a high dam immediately above the Aruz pump and sell all the water to other parties, or could build a wall around the Aruz pump and conduct the water lower down for sale to yet other persons. The Fortuna contract cannot have any such meaning as this, for the result would be that the words in question would have no meaning whatever which the defendants are bound to respect. It is quite true that the Fortuna "taking shall not deprive any owners or users of subsisting water rights or concessions of the water to which such owners or users may be entitled, either by virtue of such water rights or concessions or by virtue of any agreement or agreements in regard thereto entered into or to be entered into by them with the people of Porto Rico;" but the right of Boca Chica in this cause is not by virtue of any such water right or concession, and does not come under this exception. The Boca Chica right was merely that for the purchase of surplus water under § 33 of the Irrigation Act, and as the irrigation service had already disposed of the water in question to Fortuna, there was no surplus water left to be sold.

It follows, therefore, that the plaintiff is entitled to relief, and a permanent injunction will issue against defendants as prayed in the bill.

It is so ordered.