264 F.2d 289
 UNITED STATES of America, Plaintiff-Appellee,
v.
REPUBLIC STEEL CORPORATION, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL HARVESTER COMPANY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
INTERLAKE IRON CORPORATION, Defendant-Appellant.
 Nos. 12248-50.
 United States Court of Appeals Seventh Circuit.
 Jan. 22, 1959, Certiorari Granted June 1, 1959, See 79 S.Ct.
1150.
 
 H. C. Lumb, Cleveland, Ohio, Paul R. Conaghan, Chicago, Ill. (Stevenson, Conaghan, Hackbert, Rooks & Pitts, Chicago, Ill., of counsel), for Republic Steel Corp., defendant-appellant.
 David G. Moyer, W. S. Bodman, Chicago, Ill., Peter A. Dammann, George W. Thompson, Chicago, Ill. (Wilson & McIlvaine, Chicago, Ill., of counsel), for International Harvester Co., defendant-appellant.
 Henry E. Seyfarth, Chicago, Ill., Raymond T. Jackson, Cleveland, Ohio, Robert W. Macdonald, Chicago, Ill., Warren Daane, Cleveland, Ohio (Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Baker, Hostettler & Patterson, Cleveland, Ohio, of counsel), for defendant-appellant Interlake Iron Corp.
 Robert Tieken, U.S. Atty., Richard C. Bleloch, John Peter Lulinski, Asst. U.S. Attys., Chicago, Ill., Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Dept. of Justice Chief, Appellant Section Lands Division, Washington, D.C., for plaintiff-appellee.
 Before DUFFY, Chief Judge, and MAJOR and KNOCH, Circuit Judges.
 MAJOR, Circuit Judge.
 
 
 1
 These appeals are by Republic Steel Corporation, International Harvester Company and Interlake Iron Corporation (referred to as Republic, Harvester and Interlake, respectively), from a decree of the district court entered June 24, 1957, by which each of the defendants is 'Enjoined and Restrained from depositing or discharging and from permitting or causing directly or indirectly to be deposited or discharged into the federal channel of the Calumet River, a navigable stream of the United States, within the territorial jurisdiction of this court, between Stations 105 and 300, industrial solids, including flue dust, without first obtaining a permit from the Chief of Engineers of the Department of the Army of the United States of America, providing for satisfactory conditions for the removal of such future deposits and discharges * * *.' Each defendant is 'enjoined and ordered to restore to a depth of 21 feet below low water datum for Lake Michigan the federal channel of the Calumet River * * * between Stations 105 and 300, by dredging within a reasonable time not exceeding one year the industrial solids or wastes, including flue dust' in said Calumet River. Republic is required to remove 36.78% of 81.5%; Harvester, 36.31% of 81.5%, and Interlake, 26.91% of 81.5% 'of the aggregate of the industrial solids or wastes, including flue dust, found in the federal channel of the Calumet River * * *.'
 
 
 2
 The decree was predicated upon an opinion, findings of fact and conclusions of law, entered by the district court following a protracted hearing. United States v. Republic Steel Corporation, 155 F.Supp. 442. These reported findings to which we make reference obviate the necessity for a detailed statement of facts.
 
 
 3
 The following, taken from the findings, will suffice for the purpose of bringing into focus the issues which we think are decisive. The Calumet River at the point where it connects with Lake Michigan is located approximately 11 1/2 miles south of the Chicago Harbor, which is directly east of the Loop in the City of Chicago, Illinois, and is used by a large number of lake and foreign ships. It extends from Lake Michigan to the junction of the Little Calumet and the Grand Calumet Rivers, and leads via canals to the Illinois River and on to the Mississippi. The natural flow of the Calumet River which was toward the lake has been reversed by the Chicago Sanitary District in order to carry polluted waters away from the lake. Hence, the normal direction of the river flow since 1922 has been away from Lake Michigan, with the exception of short periods of excessively heavy rainfall.
 
 
 4
 The Calumet River is marked at 100-foot intervals, called 'stations.' Station 0 is near the Elgin, Joliet and Eastern Railroad bridge and Station 300 is just north of 130th Street. The river channel from Station 0 to Station 300 has a minimum width of 200 feet. The Corps of Engineers of the Department of the Army has been designated by Acts of Congress to maintain in the Calumet River a federal channel to the minimum depth of 21 feet, for the purpose of navigation. Such channel has been continuously maintained since the year 1881.
 
 
 5
 Harvester is located on the west bank of the river, with a river frontage extending from about 108th to 111th Street. Interlake is located on the east bank of the river, from about 107th to 111th Street, and on the west bank of the river from about 111th to 114th Street. Republic is located on the east bank and extends from 111th to about 122nd Street. All three defendants are and have been for many years engaged in the production of iron and related products. In such production they use iron ore, limestone and coke to produce iron. Each defendant produces coke from coal. Republic and Harvester each produces approximately 500,000 gross tons of iron and 1,300,000 gross tons of steel ingots per year, and Interlake produces approximately 450,000 gross tons of iron per year but no steel ingots.
 
 The trial court found:
 
 6
 'As a result of the production of iron by all three defendants, certain industrial wastes are created, consisting of flue dust containing a high percentage of iron oxide, slag, calcined lime and other solids. In the production of coke and iron and steel products, additional wastes are created, such as coke, breeze, mill scale, and other solids from the many and varied plant operations.'
 
 
 7
 Defendants in their operations pump water in vast amounts from the river. The amount taken from the river and used by the defendants each month is approximately as follows: Republic, 2,500,000,000 gallons; Harvester, 2,655,000,000 gallons, and Interlake, 1,031,120,000 gallons. This water after use is returned to the river through sewers maintained by the defendants. Republic has eight, Interlake five and Harvester fourteen sewers, all emptying into the river. Each of the defendants maintains and operates a tank-type settling basin designed to recover the fine flue dust contained in the water after its use. However, some of this dust escapes and is washed into the sewer and on into the river. There is some water which flows directly into the river through sewers, which has not passed through a settling basin. Expert witnesses testified as to the analysis of samples taken from defendants' sewers and from the river bottom in the vicinity of defendants' mills which showed a high percentage of material assignable to iron and steel mill origin. Much of the solids, generally called industrial waste, is extremely fine, not detectable by the naked eye or even by microscopic examination.
 
 
 8
 The original complaint filed by the government prayed for a prohibitory as well as a mandatory injunction to compel the defendants to restore the bed of the Calumet River 'in front of, or abutting on, their mills or establishments to the original channel depth of twenty-one (21) feet.' After the trial had been in progress for almost a month, the government, over objections by the defendants, was permitted to amend its complaint. Such amended complaint prayed for a mandatory injunction compelling the defendants to dredge not only the channel near their plants but all of the channel between Stations 105 and 300, to the original depth of 21 feet. The decree requires the defendants to dredge the channel for the distance and in the manner prayed for in the amended complaint, which means that defendants are required to dredge not only the portion of the channel adjacent to their plants but for a considerable distance both up and down stream. As to Harvester, it includes one-third mile upstream and almost three miles down.
 
 The complaint alleged:
 
 9
 '8. The continued discharge and deposit by defendants, and each of them, of industrial solids and flue dust into the channel of the Calumet River is unlawful and in violation of Sections 403 and 407 of Title 33 of the United States Code.
 
 
 10
 '9. The continued discharge and deposit by the defendants, and each of them, of industrial solids and flue dust into the channel of the Calumet River, between approximately Stations 105 and 300, constitutes an obstruction of a navigable water of the United States of America, and constitutes and creates an interference with and an obstruction to interstate and foreign commerce and navigation, to the detriment and injury of the public interest.'
 
 
 11
 The court in its conclusions of law stated:
 
 
 12
 'This action was properly brought because the defendants are discharging industrial solids into the Calumet River, in violation of the Federal Statutes, 33 U.S.C.A. 403, 407, and this constitutes an interference with navigation and commerce.' (155 F.Supp. 452)
 
 
 13
 The government in its brief before this court raises the following issue:
 
 
 14
 'Is the government entitled to an injunction as a matter of law predicated upon the provisions of 33 U.S.C. 403 and 407?'
 
 
 15
 The government in its summary of argument states:
 
 
 16
 'The evidence clearly establishes obstruction of the Calumet River by the defendants herein by the practice of discharging industrial solids consisting of flue dust and other materials into the river.'
 
 And further:
 
 17
 'The violations by the defendants of sections 403 and 407 of Title 33 United States Code, gives rise to the cause of action for injunctive relief by the United States.'
 
 
 18
 Thus, it appears plain, as was conceded by government counsel in oral argument before this court, that the case was tried and decided on the basis that defendants were and had been violating Secs. 403 and 407, and that the right of the government to injunctive relief stemmed from the authority contained in those sections. Even so, the government in this court also raises the furthr issue:
 
 
 19
 'Does the United States as a sovereign have the inherent constitutional right to apply to the courts for removal of obstructions to commerce, including obstructions of navigable streams?'
 
 
 20
 In 1896, Congress directed the Secretary of War to prepare a compilation of all general laws previously enacted by Congress for the maintenance, protection and preservation of federal navigable waters and transmit the same to Congress together with his recommendations for their 'revision, emendation or enlargement' as he should deem most 'advantageous to the public interest.' Act of June 3, 1896, 29 Stat. 202, 234. The Secretary's compilation and recommendations were transmitted to Congress on February 10, 1897. H.Ex.Doc. 293, 58th Cong., 1st Sess. After long consideration, Congress enacted the Rivers and Harbors Act of March 3, 1899, including Sec. 10 (Sec. 403, 33 U.S.C.A.) and Sec. 13 (Sec. 407, 33 U.S.C.A.) as a comprehensive and logically arranged statement of all general laws for the maintenance, protection and preservation of navigable waters, and specifically repealed all inconsistent prior general laws or parts thereof. United States v. Wilson, 2 Cir., 235 F.2d 251, 252, 253.
 
 
 21
 Section 403 enumerates three classes of prohibitions or violations, as follows:
 
 
 22
 1. 'The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited.'
 
 
 23
 2. '* * * it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any * * * navigable river * * * except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.'
 
 
 24
 3. '* * * it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any * * * channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.'
 
 
 25
 Section 407 relates to the deposit of refuse in navigable waters and provides, so far as here material:
 
 
 26
 'It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in liquid state, into any navigable water of the United States * * *.'
 
 The section further provides:
 
 27
 '* * * That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.'
 
 
 28
 It is pertinent to observe that by clause 1 of Sec. 403 an obstruction is prohibited 'not affirmatively authorized by Congress.' In contrast, the building of a structure described in clause 2, and the excavation or fill described in clause 3 of the same section, are made unlawful unless recommended by the Chief of Engineers and authorized by the Secretary of the Army. Similarly, the Secretary of the Army is authorized, under the conditions set forth, to permit the deposit of refuse otherwise made unlawful by Sec. 407.
 
 
 29
 Section 406 of 33 U.S.C.A. provides penalties for the violation of the several clauses of Sec. 403. It provides that every person or corporation violating any of such provisions 'shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court.' The section further provides that the removal of any structures or parts of structures erected in violation of the provisions of Sec. 403 may be enforced 'by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.'
 
 
 30
 Section 411 of 33 U.S.C.A. provides penalties for the violation of Sec. 407. It provides that every person or corporation violating such section 'shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction.'
 
 
 31
 It is pertinent to note at this point, although perhaps more relevant to our subsequent discussion relative to the right of the government to injunctive relief, that the sole statutory basis for such relief for a violation of any of the provisions of either Sec. 403 or 407 is that contained in Sec. 406. Such right is specifically limited to 'the removal of any structures or parts of structures' erected in violation of clause 2 of Sec. 403. Prior to a discussion of that phase of the case, however, we shall consider whether defendants have violated any of the provisions of Secs. 403 and 407. Notwithstanding that the two sections of the statute in controversy enumerate separate and distinct offenses, the government deals in a wide range of generalities. It argues that the defendants, within the terms of Sec. 403, created an unlawful obstruction, and if not that, an unlawful fill, and if neither of those, unlawfully deposited refuse matter in violation of Sec. 407. It appears, however, from what we have heretofore quoted from its complaint and summary of argument, that its principal reliance is upon an unlawful obstruction.
 
 
 32
 The government makes an appealing argument that any obstacle to navigation in the Calumet River should be removed at the expense of its creator and not at that of the government. Such argument might appropriately be made to Congress, but it is of little, if any, aid in construing the enactment before us. It must not be overlooked that the sections of the statute in controversy have remained as enacted for a period of almost sixty years, and that they should be construed in the light of the facts and circumstances then existing. Great Northern Railway Co. v. United States, 315 U.S. 262, 273, 62 S.Ct. 529, 86 L.Ed. 836; United States v. Missouri Pacific Railroad Co.,278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322. Congress no doubt possesses the power to protect navigable waters of the country, which it can exercise by its own enactments or by delegation of authority to the War Department and the Corps of Army Engineers. In dealing with navigable rights, Congress must take into consideration the interests of those who own and possess riparian rights. We apprehend that drawing the line between the two interests, that is, those of navigation and the riparian land owner, is difficult. That must have been so when the sections in controversy were enacted in 1899, and, considering the growth and development of the country, even more so today.
 
 
 33
 The question as to whether defendants have violated Secs. 403 and 407, or either of said sections, must be resolved without the aid of controlling authority, although there are cases which throw some light, the most important of which is that of United States v. Wilson, 2 Cir., 235 F.2d 251. In that case an action was brought by the United States to compel the defendants to remove a sunken barge from a navigable stream. After holding that Sec. 10 (Sec. 403, 33 U.S.C.A.) of the Act of 1899 repealed all previous laws inconsistent therewith, the court held that the government was not entitled to injunctive relief. Relative thereto the court stated (at page 253):
 
 
 34
 'As to this, the only section of the later Act which contains injunctive provisions possibly applicable here is 12, 33 U.S.C.A. 406. The injunctive power so provided is expressly limited to 'the removal of any structures or parts of structures erected in violation of the provisions of' 9, 10 and 11 of the 1899 Act. 33 U.S.C.A. 401, 403 and 404. Clearly, our sunken barge is not a structure prohibited by 9 and 11 which were concerned with bridges, dams, piers, wharves, etc. Nor, we hold, was it a 'structure's as denounced in 10, 33 U.S.C.A. 403. In re Eastern Transportation Co., D.C., 102 F.Supp. 913. That section prohibits, first, 'The creation of any (unauthorized) obstruction * * * to the navigable capacity' of United States waters, and, second, the building of 'any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures' in any port, etc. It thus makes a plain distinction between 'obstructions' and 'structures.' Section 12, 33 U.S.C.A. 406, deliberately we think, restricts its injunctive power to 'structures' and thereby excluded from its injunctive scope the 'obstructions' denounced by 10, 33 U.S.C.A. 403.'
 
 
 35
 In United States v. Brazoria County Drainage Dist. No. 3, D.C., 2 F.2d 861, the government sought to enjoin and abate the operation of a drainage district which discharged into a navigable waterway. The deposit of silt from such drainage district was greater than normal because of faulty construction of the ditch. The government relied upon the alleged violation of Sec. 403 and upon the remedy provided by Sec. 406. In an opinion by Judge Hutcheson (then a District Judge, at present Chief Judge of the Fifth Circuit), it was held that there was no violation of Sec. 403, and injunctive relief was denied. In doing so the could stated (at page 862):
 
 
 36
 'That these statutes prohibit the erection of structures in navigable streams, unless the plans therefor have been approved by the War Department, and authorize the removal of such structures placed without such approval, is plain. That they do not apply to washing or erosion caused by drainage, and that the prohibitory features of the statutes cannot be distorted so as to cover the operations of drainage districts, is equally plain.'
 
 
 37
 In United States v. Burns, C.C., 54 F. 351, the court granted a motion to quash a court of an indictment which alleged a violation of Sec. 10 of the Rivers and Harbors Act of 1890, a predecessor of Sec. 403, which prohibited 'the creation of any obstructions, not affirmatively authorized by law, to the navigable capacity of any' navigable waters. The alleged violation consisted of throwing and placing rafts, logs, sticks, boats and other objects in a navigable river. In holding the section inapplicable the court stated (at page 363):
 
 
 38
 'I think that the obstructions contemplated by the tenth section-- those that have not been affirmatively authorized by law, and are therefore prohibited-- are such obstructions as are permanent in their nature, as are created for special purposes, by the usual modes of construction. I cannot agree with the district attorney in his construction of the statute, and I cannot hold that it was the intention of congress, by this tenth section, to prohibit the floating of rafts, logs, timber, boats, and vessels, loose and adrift, in and upon the navigable waters of the United States.'
 
 
 39
 As shown, the amended complaint alleged that the discharge and deposit by defendants of industrial solids and flue dust in the channel of the Calument River constitutes an 'obstruction' of navigable water. The decree and the principal argument here rest upon the same premise. The government in its brief states:
 
 
 40
 'The proof in this case is clear that the deposits in question create an obstruction to the navigable capacity of the Calumet River, a navigable water of the United States.'
 
 
 41
 Assuming that defendants' activities result in an obstruction in fact, it does not follow that it is an obstruction in contemplation of law. State of Pennaylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 430, 432, 59 U.S. 421, 430, 432, 15 L.Ed. 435, 437; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 64, 33 S.Ct. 667, 57 L.Ed. 1063. The government's contention that the deposit of material in the Calumet River constitutes an obstruction in contemplation of law, that is, in violation of Sec. 403, is inconsistent with the relief sought and that granted because the government sought and obtained an injunction preventing the deposit complained of without a permit from the Department of the Army and requiring its removal in a manner satisfactory to the same governmental agency. Congress did not give the Army or its Engineers authority to authorize, sanction or reccommend an obstruction which it had prohibited. Such was made lawful only when 'affirmatively authorized by Congress.' If the words, 'any obstruction,' are given their broad, inclusive scope, which the government would have us do, there would be no reason for the second and third clauses of Sec. 403. For that matter, there would be no reason for Sec. 407. Everything which might constitute an obstruction in fact would also constitute an obstruction in contemplation of law and could be lawful only when 'affirmatively authorized by Congress.'
 
 
 42
 The court, in State of Wisconsin v. State of Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426, must have had this thought in mind. Referring to Sec. 10 (403) the court stated (278 U.S. at page 413, 49 S.Ct. at page 170):
 
 
 43
 'If the section were construed to require a special authorization by Congress whenever in any aspect it might be considered that there was an obstruction to navigable capacity, none of the undertakings specifically provided for in the second and third clauses of section 10 could safely be undertaken without a special authorization of Congress. We do not think this was intended.'
 
 
 44
 It is too plain to require discussion that defendants did not violate clause 2 of Sec. 403, which makes it unlawful 'to build or commence (to build) * * * structures in any * * * navigable river.' (See United States v. Wilson, 235 F.2d 251, above cited, and the quotation therefrom.) The government does not contend otherwise.
 
 
 45
 The government in its brief, as to clause 3 of Sec. 403, states:
 
 
 46
 'While Section 403, Title 33 U.S.C.A. prohibits the building of obstructions of a permanent nature nevertheless it also provides that no one shall '* * * fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge or inclosure within the limits of any breakwater or of the channel of any navigable water of the United States."
 
 
 47
 It would appear by this statement that the government is doubtful of its premise that defendants' deposits in the channel constituted an obstruction such as is prohibited by the first clause of the section. Moreover, in the quotation important language is omitted. The quotation should commence, 'excavate or fill,' and should conclude, 'unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.' Do the deposits made by the defendants over a course of years, which progressively built up so as to result in an obstacle to navigation, constitute a 'fill' within the contemplation of this clause? The question has never been considered by a court, so far as we are aware. In our view, however, giving effect to the ordinary meaning of the words employed, the question must be answered in the negative. Defendants, in pumping water from the channel, remove much material which is afterward returned in part in its water discharge. It would seem quite unreasonable to refer to such removal as an excavation and almost as unreasonable to think of the discharge as a fill. More than that, it appears that Congress placed its own definition upon the words, 'to excavate or fill,' when it referred to such operations as 'the work,' which might be recommended and authorized by the specified federal officials. It would be a strained and unrealistic appraisal of the language employed by Congress to hold that defendants by depositing material in the channel were engaged in a 'work' which might have been recommended prior to beginning. It seems more reasonable to believe that Congress had in mind an operation the effect of which on navigation could be determined in advance so that the designated federal officials could approve or disapprove.
 
 
 48
 This brings us to Sec. 407 (heretofore quoted), which makes unlawful the deposit in navigable waters of 'any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state.' As previously noted, the sole penalty provided for a violation of this section is found in Sec. 411 and consists of punishment by fine or imprisonment. Obviously, the pertinent question is whether the deposits were 'refuse matter * * * other than that flowing from streets and sewers and passing therefrom in a liquid state.' It is evidence that if such deposits come within the scope of the exception, they are excluded from the terms of the section.
 
 The trial court found:
 
 49
 'Although sewer outfalls are emptying many fine particles of less than 325 mesh, nevertheless those fine particles tend to flocculate into larger units, that is, they are attracted nd held together by electrical forces and tend to deposit loosely on the river bottom in a form that could be represented on a langer scale by a pile of matchsticks dropped at random. Larger and heavier particles tend to fall into the settled flocculated material without increasing the volume. A study of the solids found in various shoals in the vicinity of the mills showed a high accumulation of iron oxide. This is primarily due to industrial waste coming from the three defendants' mills.'
 
 The court further found:
 
 50
 'These solids are in excess of those being transported in the water at the time it is being pumped out of the river by the defendants. The solids being deposited in the Calumet River from the sewers of the defendants are being transported by suspension in the water and are not in solution or in a liquid state.'
 
 
 51
 The proof relative to the contents of the water flow from the sewers of Interlake appears to be typical. An analysis disclosed that the effluent from its sewers averaged more than 99 1/2% water. Analyses of the samples from three sewers showed that from 63 to 85.9% of the material in suspension passed through a 325 mesh screen or was smaller than 44 microns. The analysis of material in suspension flowing from another sewer showed that 90.5% was finer than 62 1/2 microns, and that 80.3% was finer than 31 microns. Pelto, an expert witness for the government, testified that a micron is a millionth of a meter, a thousandth of a centimeter, and that he did not know 'the smallest diameter in micron that would be visible to the naked eye.' He was asked, 'What is the smallest diameter in microns that you could see with the microscope that you used?' He answered, 'We can see ordinarily pretty well down to about one micron or a little bit less, down to about the wave length of light, where we can draw some conclusions of the material.' Einstein, another government expert witness, expressed the opinion that some of the particles in controversy could be detected by a microscopic examination but that 'there are lots of particles in there that are too small to be seen under a microscope and those particles are the worst offenders because they make the strongest and the fluffiest of the deposits.'
 
 
 52
 As previously shown, both Secs. 407 and 403 were enacted in 1899, and should be interpreted in the light of the environment of that period. In 1900, out of a total urban population of more than 30 million, the aggregate of such population which provided any degree of treatment for its domestic and trade wastes was about one million. In other words, less than 3 1/2% of such population provided for such treatment. Modern Sewage Disposal (1938), p. 13 (published by the Federation of Sewage and Industrial Waste Associations, Langdon Pearse, Editor, 50th Anniversary Book, Lancaster Press, Inc.). The domestic and trade wastes of the remaining urban communities were discharged without treatment into the nearest body of water and carried large quantities of solids in suspension or in unstable or impermanent solution. Throughout this period, a statute which prohibited the discharge of street runoffs, or of domestic or trade wastes flowing from sewers which carried any solids in suspension or impermanent solution, would have outlawed the method universally used for the disposal of such wastes. We agree with defendants that there should not be attributed to Congress an intent to produce such a drastic change, in the absence of clear and compelling statutory language.
 
 
 53
 As noted, defendants each maintain settling basins and other devices for the purpose of capturing from their sewer outlets as much as possible of this so-called industrial waste. There is some variance in the testimony as to the extent of their success in this respect. We think it fair to assume from the proof that the flow from defendants' sewers contains less than 1/2% of industrial waste. All the waste which escapes is in particles so extremely fine that they cannot be detected with the naked eye; in fact, much of it is not detectable under microscopic examination.
 
 
 54
 Legislation previous to the Act of 1899 throws some light on what Congress intended. The first general Act was that of 1890, which prohibited dumping into navigable waters 'any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse or other waste of any kind * * * which shall tend to impede or obstruct navigation.' In Sec. 407 of the Act of 1899, now under discussion, Congress omitted the enumeration of specific forms of debris or waste and in general terms prohibited the discharge or deposit of 'any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state.' Thus, Congress in the Act of 1899 failed to specify the items as it had previously done but covered the same in general language, and at the same time excluded 'that flowing from streets and sewers and passing therefrom in a liquid state.'
 
 
 55
 Defendants argue, we think with plausibility, that Congress inserted the exception for the purpose of making it clear that the statutes would not outlaw the practices then in existence with respect to the disposal of street runoffs and of domestic and trade wastes flowing from sewers into navigable streams. This view is fortified when we contemplate the consequences of a contrary interpretation which would make the exception meaningless. At any rate, this would be the result of holding the exception without application solely on the basis that the water flowing from defendants' sewers contained particles which made up an infinitesimal amount of the whole and which were so tiny that they could be detected only with great difficulty. Such an interpretation would limit the exception to water free from all sedimentation or solids however small or inconspicuous they might be. It is not reasonable to believe that Congress intended such an incongruous result when it excepted from the section refuse matter flowing from streets and sewers and passing therefrom in a liquid state.
 
 
 56
 Here again, the government's argument is directed at what the law should be or what the government would like it to be rather than at what it is. For instance, the government in its brief states:
 
 
 57
 'Interlake points out that 'throughout our history navigable waters have been used not only for navigation but also for manufacturing, for domestic purposes, and for the disposal of domestic and industrial trade waste.' This may have been true in the past and may still be true in certain areas of the country. However, when the surrounding development reaches a certain point domestic wastes, such as sanitary sewage, are excluded from all bodies of water, if they have not received clarifying treatment. In this view reference may be made to the Interstate Compacts to control pollution of the Ohio river system and to the streams of the eastern section where local enforcement has forced the coal mining institutes to clean up the public nuisance created by the discharge of waste water into the local streams.'
 
 
 58
 We are not able to discern how restrictions imposed by state and other local agencies to prevent pollution of navigable or non-navigable water, or the discharge of industrial waste into the same, under present day conditions has any bearing upon or furnishes any aid to the construction of a statute enacted almost sixty years ago. Moreover, it appears that the Interstate Compact to which the government refers provided that water shall be so treated 'as to provide for substantially complete removal of settleable solids, and the removal of not less than forty-five per cent (45%) of the total suspended solids.' See State ex rel. Dyer v. Sims, 341 U.S. 22, 24, 71 S.Ct. 557, 558, 95 L.Ed. 713. This appears to recognize the obvious, that is, that industrial or domestic wastes or street runoffs are never free from solids carried in suspension or in unstable solution.
 
 
 59
 In our judgment, defendants' activities do not constitute a violation of Sec. 407, by reason of the exception contained therein. Even so, we think the government's contention as it relates to Sec. 407 is more plausible than its contention as it relates to the provisions of Sec. 403. Moreover, the government's strong reliance upon Sec. 407 fortifies our view, previously expressed, that there was no violation of Sec. 403. It seems certain that if defendants violated Sec. 407 by the deposit of refuse under the circumstances therein set forth, they were clearly not in violation of Sec. 403 by the creation of an obstruction, by the building of a structure or by the creation of a fill.
 
 
 60
 In view of our conclusion that the activities of defendants under attack do not constitute a violation of any of the provisions of Sec. 403, or a violation of Sec. 407, there may be no necessity to proceed further. However, in recognition of the fact that the conclusions which we have reached, or some of them, might be erroneous, and as a matter of precaution, we shall consider the government's asserted right to injunctive relief. Such discussion, of course, must be predicated upon the assumption, contrary to what we have held, that the government has shown a violation of Secs. 403 and 407, as pleaded and as found and concluded by the district court. In this connection it is pertinent to observe that no statutory basis for injunctive relief is pointed out either in the findings, conclusions or decree of the district court, or in the brief and argument presented to this court. That Congress has not only failed to authorize such relief but has by strong implication excluded the same is made clear from an examination of the relevant statutory provisions.
 
 
 61
 As is apparent from our previous discussion, the government takes no firm stand on the precise violation upon which it relies. It wavers between its various theories that defendants have violated clause 1 of Sec. 403 by the creation of an obstruction, or clause 3 of the same section by the creation of a fill, or Sec. 407 by the deposit of refuse. At no place, however, does the government contend that defendants have violated clause 2 of Sec. 403 by building or commencing to build 'any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures.' Sec. 406 provides penalties of fine or imprisonment for the violation of each of the provisions of Sec. 403, and Sec. 411 provides similar penalties for a violation of Sec. 407. The sole provision authorizing injunctive relief for the a violation of any of the provisions of Sec. 403 or Sec. 407 is that found in Sec. 406, which provides:
 
 
 62
 '* * * And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections (referring among others to Sec. 403) may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.'
 
 
 63
 As already noted, Secs. 403 and 407, as well as Secs. 406 and 411 the penalty sections), were all enacted at the same time as parts of the comprehensive Act of March 3, 1899. It is hardly conceivable that Congress intended to authorize injunctive relief for all violations when it expressly limited such relief to a single definitely described form of violation. It is more reasonable to think that Congress deliverately withheld the right to such relief in all instances other than for the violations set forth in clause 2 of Sec. 403.
 
 
 64
 We have previously noted the opinion of the Second Circuit in United States v. Wilson, 235 F.2d 251, which supports this analysis and interpretation of the provisions in controversy. We have cited and quoted from this opinion and need not repeat. It is sufficient to again state that the court held that the government was not entitled to an injunction to compel the removal of a sunken barge, on the ground that Congress had authorized injunctive relief only for a violation of clause 2 of Sec. 403, and that a barge was not a structure as enumerated in that clause. This is the only case, so far as we are aware, which has considered and decided the precise question under discussion. The government makes no mention of this case in its brief.
 
 
 65
 The Act of 1890 was repealed by the Act of 1899. A comparison of the two Acts reveals a significant circumstance bearing upon the intent and purpose of Congress. Sec. 10 of the repealed Act (see United States v. Bellingham Bay Boom Co., 176 U.S. 211, 20 S.Ct. 343, 44 L.Ed. 437) provided among other things 'That the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, * * * is hereby prohibited.' This section provides a penalty of fine and imprisonment for a violation of the prohibition and that 'such obstruction may be caused to be removed by the injunction of any circuit court exercising jurisdiction in any district in which such obstruction may be threatened or may exist; and proper proceedings in equity to this end may be instituted under the direction of the Attorney General of the United States.' This right to an injunction to require removal of an unlawful obstruction, contained in the Act of 1890, was omitted from the Act of 1899. Thus, Congress by the latter enactment withdraw the right to obtain the removal of an obstruction by injunction, a right which it had bestowed in its enactment of 1890. We have no way of knowing, in fact need not be concerned with the motivation which caused Congress by the 1899 Act to withdraw the right to injunctive relief, which it had provided for in the Act of 1890.
 
 
 66
 In Wheeler v. Greene, 280 U.S. 49, 51, 50 S.Ct. 21, 74 L.Ed. 160, the court, referring to a similar situation, stated:
 
 
 67
 'When so important a grant of power contained in the prototype is left out from the copy it is almost impossible to attribute the omission to anything but design, or to believe that it left to very attenuated implications what the model before it so clearly expressed.'
 
 
 68
 This appears an appropriate point to refer to two of the cases relied upon by the government in support of its asserted right to injunctive relief. United States v. Bellingham Bay Boom Co., 176 U.S. 211, 20 S.Ct. 343, 44 L.Ed. 437; United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136. As shown, supra, the court in the Bellingham case relied upon the Act of 1890, which expressly provided for injunctive relief. The Rio Grande case falls in the same category. In the latter case the court stated (19 S.Ct. at page 777):
 
 
 69
 'The creation of any such obstruction may be enjoined, according to the last provision of the section, by proper proceedings in equity, under the direction of the attorney general of the United States, and it was in pursuance of this clause that these proceedings were commenced.'
 
 
 70
 It appears reasonably certain that the court in each of those cases would have reached a different result absent an express statutory provision authorizing injunctive relief. In fact, it is not difficult to visualize that neither action would have been commenced without such a provision.
 
 
 71
 The government cites other cases in support of its statutory right to injunctive relief, including Sanitary District of Chicago v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352, and People of State of New York v. State of New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937. A detailed analysis and discussion of these cases would unduly prolong this opinion. If the construction and interpretation which we have placed upon Secs. 403 and 407 is correct, none of these cases has any application. The case which perhaps makes the nearest approach is the Sanitary District of Chicago case. The government in its brief quotes from this case as follows (266 U.S. at page 425, 45 S.Ct. at page 178):
 
 
 72
 'The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction. It has a standing in this suit not only to remove obstruction to interstate and foreign commerce, the main ground, which we will deal with last, but also to carry out treaty obligations to a foreign power bordering upon some of the Lakes concerned, and, it may be, also on the footing of an ultimate sovereign interest in the Lakes.'
 
 
 73
 This statement must be considered in connection with the nature of that case. The action was brought by the United States to enjoin the Sanitary District of Chicago from the withdrawal of water from Lake Michigan in excess of an amount authorized by the Secretary of War. The case involved a conflict between State and Federal power, and it was held that the United States in the exercise of its sovereign power had standing to enforce by injunctive relief treaty obligations to a foreign power, to protect its sovereign interest in the Great Lakes and to prevent a State from interfering with the constitutional power of the United States because 'in matters where the national importance is imminent and direct even where Congress has been silent the States may not act at all.' Thus, the situation before the court in that case was far different from that of the instant case. It is significant to note that the Second Circuit, in United States v. Wilson, 235 F.2d 251, cited and quoted from above, made no mention of the Sanitary District case, even though it was, so we are advised, cited by the government in its brief.
 
 
 74
 Moreover, it appears that the Supreme Court later had some misgiving as to its holding, certainly as to its reasoning, in the Sanitary District case. In State of Wisconsin v. State of Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426, decided some four years later, the court, referring to its decision in the Sanitary District case, stated (278 U.S. at page 414, 49 S.Ct. at page 170):
 
 
 75
 'The decision there reached and the decree entered can not be sustained, except on the theory that the court decided first, that Congress had exercised the power to prevent injury to the navigability of Lake Michigan and the other lakes and rivers in the Great Lakes watershed * * *.'
 
 
 76
 In People of State of New York v. State of New Jersey, supra, (256 U.S. 296, 41 S.Ct. 496) an original action was commenced in the Supreme Court by the former State to enjoin the latter from discharging a large volume of sewage into Upper Bay, a part of New York harbor. The court sustained the right of the Federal government to intervene, upon allegations that the sewage discharge would interfere with navigation and 'that practically irreparable damage will be caused to the extensive properties owned by the government adjacent to the bay.' The fact that the government was permitted to intervene in an action pending before the Supreme Court furnishes no support, in our view, for its right to commence an original action for injunctive relief in the district court.
 
 
 77
 As previously noted, this case was pleaded, tried and decided upon the basis that the government was entitled to injunctive relief as a matter of statutory right. Here, however, we are confronted with the argument, advanced for the first time so far as we are aware, that the government, irrespective of statutory power, is entitled to the relief sought and allowed. The government in its brief states:
 
 
 78
 'The United States as an attribute of sovereignty has the inherent and constitutional right and power to regulate commerce, particularly navigation and navigable streams. This is in addition to the statutory power and right of the United States with respect to the shoaling of the river bed here in question (33 U.S.C. 403 et seq.). It is our further position, however, that independent of the statutes, the government would have a right to the injunction and the decrees herein granted.'
 
 
 79
 We do not agree with this contention. Undoubtedly the Federal government has the constitutional right and power to regulate commerce, including that concerned with navigation and navigable streams. Even so, we do not understand that the commerce clause of the Constitution is self-executing. Const. art. 1, 8, cl. 3. Here, we have a situation where Congress, acting under its constitutional power, has enacted a statute covering and controlling the subject matter. The government, in our view, has only such rights as Congress has provided.
 
 
 80
 The government cites what it refers to as the landmark case of Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23, in support of the proposition that navigation and navigable streams are subject to the commerce power of the United States. That case also supports the proposition that such power can only be exercised by Congress. In Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 815, 31 L.Ed. 629, the court stated:
 
 
 81
 'The power of congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned. But until it does pass some such law, there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers * * *. There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the states.' (Cited and quoted with approval in United States v. Bellingham Bay Boom Co., 176 U.S. 211, 20 S.Ct. 343, 345, 44 L.Ed. 437.)
 
 
 82
 In United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 777, 43 L.Ed. 1136, the court, referring to the Act of 1890 (heretofore discussed), stated:
 
 
 83
 'It was an exercise by congress of the power, oftentimes declared by this court to belong to it, of national control over navigable streams; and various sections in this statute * * * provide for the mode of asserting that control.'
 
 
 84
 In United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 672, 57 L.Ed. 1063, the court stated:
 
 
 85
 'So unfettered is this control of Congress over navigable streams of the country that its judgment as to whether a construction in or over such a river is or is not an obstacle and a hindrance to navigation is conclusive. Such judgment and determination is the exercise of legislative power in respect of a subject wholly within its control.'
 
 
 86
 Upon this phase of its argument the government quotes at length and places great reliance on In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092. We have read this opinion and are of the view that it has no application to the instant situation. The government's own appraisement of the opinion discloses its irrelevancy. Referring to that case, the government in its brief states, 'The cited opinion held that Congress has full power over channels of interstate commerce and the regulation of the mails.' That is a far cry from the government's contention here that it has the inherent right, independent of congressional enactment, to injunctive relief. Thus, the government's concession concerning the Debs case is consistent with our view that the government has only such rights as are expressly provided by statute.
 
 
 87
 The government, as previously noted, makes an appealing argument that defendants should be required by a mandatory injunction to remove from the Calumet River any and all deposits for which they are responsible. It is an argument, however, which in our judgment should be made to Congress rather than to a court. As stated in Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488:
 
 
 88
 'Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive.'
 
 
 89
 We find no occasion to state or discuss the numerous other grounds upon which defendants attack the validity of the decree. We hold there is no legal basis, statutory or otherwise, upon which the government is entitled to injunctive relief.
 
 
 90
 The decree appealed from is reversed and the cause remanded, with directions that the complaint be dismissed.