UNITED STATES of America, Plaintiff,

v.

**ATLANTIC–RICHFIELD COMPANY, and the Anaconda Company, Defendants.**

No. CV 78–80–M.

United States District Court, D. Montana, Missoula Division.

Nov. 1, 1979.

---

Robert T. O'Leary, U. S. Atty., Butte, Mont., James W. Moorman, Steven A. Herman, David Waters, David C. Cannon, Jr., U. S. Dept. of Justice, Land & Natural Resources Division, Washington, D. C., Ezra Rosenberg, Trenton, N. J., for plaintiff.

Poore, Roth, Robischon & Robinson, James A. Robischon, Butte, Mont., for Krest Cyr.

Miller, Anderson, Nash, Yerke & Wiener, John F. Newpert, Portland, Or., Garlington, Lohn & Robinson, Wm. E. Jones, Missoula, Mont., for defendants.

## OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

The gravamen of plaintiff's amended complaint is that the deposit on plaintiff's property (Flathead National Forest and Glacier National Park) of fluoride emissions from Anaconda's Columbia Falls aluminum reduction plant constitutes a trespass. Plaintiff seeks damages for the past injury to trees and wildlife and an injunction ordering defendants to reduce fluoride emissions to a level which will not cause further death or injury to vegetation and wildlife. The court has jurisdiction pursuant to 28 U.S.C. § 1345.

Pursuant to Fed.R.Civ.P. 12(b), defendants have moved to dismiss, first, for failure to state a claim and, second, because the court lacks jurisdiction of the subject matter in that primary jurisdiction rests with the Montana Board of Health and Environmental Sciences.[1] Defendants concede that the motion to dismiss raises questions only with respect to the injunctive relief and that the United States, as proprietor, does have an action for damages.

Pursuant to the Montana Clean Air Act, Montana Code Annotated (hereinafter MCA) §§ 75–2–101—75–2–413 (1978), the Board of Health and Environmental Sciences (Board), acting under MCA § 75–2–203, has established an emission standard for the Anaconda Columbia Falls plant at 864 pounds of gaseous and particulate fluorides per day. That plant has not met this standard, but rather, since 1974, has operated under variances granted by the Board under the provisions of MCA § 75–2–212.

██ Under MCA § 75–2–202, the Board *must* establish ambient air quality standards for the state. These standards may be expressed in terms of the number of allowable parts of fluoride per billion parts of air. The Board is currently proposing new ambient air standards, including new fluoride air quality and vegetation standards. The draft environmental impact

---

1. I do not decide whether technically there is one question or two. In any event, the one answer found would answer either.

statement (EIS) will be subject to public review, and testimony will be taken before a final EIS is issued.

■ The federal Clean Air Act, 42 U.S.C. §§ 7401–7642, also contains elaborate administrative procedures for establishing ambient air quality standards and federally enforceable emission standards. The Environmental Protection Agency (EPA) may establish air quality criteria for a pollutant which reasonably may be anticipated to endanger public health or welfare, and then establish a primary standard for pollutants affecting the public health and a secondary standard for those affecting public welfare. 42 U.S.C. §§ 7408 and 7409. The EPA has not adopted ambient air standards for fluoride, but it has promulgated a standard for new stationary sources which translates into 1000 pounds of total fluorides per day. 42 U.S.C. § 7411; 40 C.F.R. § 60.192(a)(1). When standards for new sources are promulgated, the state is required to adopt an emission standard for existing sources and to provide for the implementation and enforcement of such standards. 42 U.S.C. § 7411(d)(1). For the purposes of this opinion, it is assumed that the state standard is or will be a standard enforceable against all persons, including the United States, and that the state standard will be equal to or more stringent than the standard adopted by the United States. 42 U.S.C. § 7416.

It is alleged that the Anaconda plant is emitting approximately 4000 pounds of fluorides per day and that any emission in excess of 200 pounds per day will continue to damage the vegetation and wildlife on plaintiff's property.

■ Absent the federal and state clean air acts, the United States, acting in its proprietary capacity, had a right to injunctive relief. Usually the United States, as an owner of real property, has the same right to protect it in law or in equity as does a private party, and the Attorney General is the officer who decides whether an action should be brought. *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888).[2]

If this proprietary right of the United States to protect its property in the courts survived the passage of the federal and state clean air acts, then the court has jurisdiction,[3] and the complaint states a claim.[4]

■ Congress no doubt had the power to preempt the field and make the remedies provided by the federal act exclusive of any right in the United States to secure injunctive relief in the courts.[5]

■ It is my opinion that Congress did not divest the United States of the right to sue for injunctive relief in air pollution cases affecting its property. There is no

---

**2.** *See also Light v. United States*, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *Jones v. Freeman*, 400 F.2d 383 (8th Cir. 1968), and cases cited; *Perko v. United States*, 204 F.2d 446 (8th Cir. 1953).

**3.** As to the common question in the assertions of lack of jurisdiction and failure to state a claim, *see Texas & Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 435–36, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

**4.** Because the complaint seeks not to enforce the state standards but to enjoin the emission of more than 200 pounds of fluorides per day, a level much lower than that presently created by the state, I consider the case as one in which the court is asked to create and enforce a standard of emissions different from that which may be established by a federally-approved state standard.

**5.** As urged by the defendants, there are many reasons which would make one exclusive administrative system of controlling air pollution desirable. The whole matter is highly complex and involves the intricacies of chemistry, engineering, and economics. Courts are not especially equipped to deal with these problems. Courts cannot provide the necessary constant supervision. If the courts are permitted to interfere, their decisions will sooner or later come into conflict with the administrative decisions and create confusion and uncertainty. It is paradoxical that an elaborate administrative system for the establishment, enforcement, and review of air pollution controls may be short-circuited by a suit for an injunction. These considerations are, however, for legislative consideration and are only important to a court if the language used by Congress is susceptible of an interpretation that Congress did what perhaps it should have done.

express language in the act which divests the United States of its injunctive remedies. Without using express language, a legislature might so clearly manifest an intent to make a remedy exclusive that a court would be obliged to hold a statutory scheme of regulation to be exclusive. Thus, in *Texas Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907),[6] the Supreme Court declared that the acts of Congress creating the Interstate Commerce Commission supplanted the common law right of action to recover unreasonable freight rates notwithstanding a savings clause. A similar effect has been given state statutes regulating water pollution. *Ellison v. Rayonier, Inc.*, 156 F.Supp. 214 (W.D.Wash.1957); and *People v. New Penn Mines, Inc.*, 212 Cal.App.2d 667, 28 Cal.Rptr. 337 (1963).

▆▆▆ The cited cases involve private disputes, while in this case it is the right of the United States which is sought to be limited. Such a limitation is not as easily inferred where the United States, as distinguished from all others, is concerned. The language of *Dollar Savings Bank v. United States*, 86 U.S. (19 Wall.) 227, 239, 22 L.Ed. 80 (1873):

> "It is a familiar principle that the King is not bound by any act of Parliament unless he be named therein by special and particular words. The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him in the least, if they may tend to restrain or diminish any of his rights and interests. He may even take the benefit of any particular act, though not named. The rule thus settled respecting the British Crown is equally applicable to this government, and it has been applied frequently in the different States, and practically in the Federal

courts. It may be considered as settled that so much of the royal prerogatives as belonged to the King in his capacity of *parens patriae*, or universal trustee, enters as much into our political state as it does into the principles of the British constitution."

(footnotes omitted), is still viable, at least to the extent that statutes which divest " 'preexisting rights or privileges will not be applied to the sovereign' 'without a clear expression or implication to that effect.' " *Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976); *United States v. Wittek*, 337 U.S. 346, 69 S.Ct. 1108, 93 L.Ed. 1406 (1949).

It seems to me that the language of the act suggests that the federal government does retain its common law rights. Thus, 42 U.S.C. § 7610(a) provides: "Except as provided in subsection (b) of this section, this chapter shall not be construed as superseding or limiting the authorities and responsibilities, under any other provision of law, of the Administrator or any other Federal officer, department, or agency."

In *Illinois v. Milwaukee*, 599 F.2d 151 (7th Cir. 1979), the court said that similar language in the Water Pollution Control Act (33 U.S.C. § 1371(a)) suggested a preservation of the common law of nuisance.

▆▆▆ The federal Clean Air Act does preserve a citizen's right to sue, and 42 U.S.C. § 7604, which is entitled "Citizen suits," and which first grants to citizens a right to sue for violation of any standard or order issued by the administrator or state in such matters, in subsection (e) provides in pertinent part: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the

---

6. In the rate cases, where the purpose of the law is to create equal rates for all (*Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Texas Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)), uniformity is a must. Different actions by different bodies would lead to different rates for different people. Here,

however, the clean air acts recognized that there cannot be a uniform treatment of all pollution sources, and the acts do not seek to achieve such. Nonuniformity is built in. The problem of differing results as to the same person remains, but such a lack of uniformity is not destructive of the very principle upon which the clean air acts rest.

Administrator or a State agency)." This and comparable savings clauses are held to preserve the common law nuisance remedies. *See Illinois v. Milwaukee*, 599 F.2d 151 (7th Cir. 1979); *California Tahoe Regional Planning Agency v. Jennings*, 594 F.2d 181 (9th Cir. 1979). Thus the express language of the act negates any thought that the remedies provided by it were exclusive of rights at common law because they were preserved for a wide class of persons. All of the vices which may flow from a dual system are present when such a wide group of persons is permitted to bring actions for damages or injunctive relief.

■ Certainly the implication of the repeal of common law rights is stronger where a law does repeal the rights of all others but is silent as to the United States than the implication is where, as here, the law saves as to all others but is silent as to the United States. Yet even in the former case repeal will not be implied as to the United States. In the case of *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the United States had seized the nation's coal mines and was in possession of them. The mines were operated by the United States and the former employees of the mine owners were employees of the United States. In violation of a temporary injunction the mines were struck, and the Union and its president were fined for contempt. In the course of sustaining the contempt convictions the Court held that statutory provisions restricting the right of employers to secure injunctions did not apply to the Government as an employer, even though it did not apply to all other employers, and there were no express words in the provisions exempting the Government. The Court relied on the rule stated in *Dollar*

*Savings Bank v. United States*, 86 U.S. (19 Wall.) 227, 22 L.Ed. 80 (1873).

Plaintiff claims that the common law remedies are preserved as to "any person" by 42 U.S.C. § 7604(e) and that "person" as defined in Section 7602(e) includes any agency, department, or instrumentality of the United States.[7] Defendants, on the other hand, argue that, as Section 7602(e) appeared before amendment,[8] the instrumentalities of the United States were not mentioned and that they were added to the definition of "any person" not for the purpose of preserving rights of the United States but to express an unambiguous intent that the permit provisions of the act should apply to the instrumentalities of the United States.[9] Certainly the legislative history bears out this contention, but in my view nothing turns on Section 7604(e), taken in conjunction with Section 7602(e), either before or after its amendment. Congress labelled Section 7604 with the words "Citizen suits" and the section vests in various persons rights to enforce the Act and the standards established under it. Pertinent to the problem of citizens' remedies was the problem of the preservation of citizens' common law rights. The section is not concerned with the right of the United States to enforce the act and does not grant rights to the United States. The preservation of the common law rights of the United States is not pertinent to a section dealing with citizen suits.

■ In my opinion, therefore, Section 7604(e) does not expressly preserve the common law rights of the United States but, in the act as a whole, I do not find any clear "expression or implication" of an intent to abolish common law rights of the United States, and I believe they remain.[10]

---

7. 42 U.S.C. § 7602(e) defines the term "person" as follows: "The term 'person' includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof."

8. *See* 42 U.S.C. § 1857h(e) (1970).

9. *See* legislative history of P.L. 95–95, 95th Cong., 1st Sess. *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1077, 1279.

10. I do not believe that *United States v. Republic Steel Corp.*, 264 F.2d 289 (7th Cir. 1959), *rev'd on other grounds*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), relied on by defendants, is contrary. In that case the Government sought to enjoin the defendants from dumping

For the reasons stated, the motion to dismiss is denied.

In my opinion this order involves controlling questions of law as to which there is substantial ground for difference of opinion, and an immediate appeal from this order, in accordance with 28 U.S.C. § 1292(b), may materially advance the ultimate termination of this litigation.

This certification shall not stay the proceedings herein.

industrial wastes into a navigable river. The circuit court held that the specific sections relied upon were not violated and that the Government had a broad power to regulate navigation, that the commerce clause was not self-executing, and that the Government had only such rights as Congress provided. The court was not concerned with, and did not decide, what kind of language was necessary to abolish some preexisting right or remedy of the United States.

The result here is contrary to that reached in *New Mexico ex rel. Norvell v. Arizona Public Service Co.*, 85 N.M. 165, 510 P.2d 98 (1973), if New Mexico asserts the same sort of sovereignty as does the United States. In any event, the opinion does not consider the problem of interpretation where the sovereign is involved.

In the view I have taken, it is unnecessary to consider what effect the savings clause found in the state law would have. If a state regulation is made effective as to the United States because of its adoption by the law of the United States, do not the savings clauses in it apply to the United States?